UNITED STATES of America, Plaintiff,

v.

NORTH SIDE DEPOSIT BANK,
Defendant.

UNITED STATES of America, Plaintiff,

v.

LIBERTY VEHICLE LEASING, INC.,
North Side Deposit Bank,
Defendants.

Civ. A. Nos. 80–487, 81–551.

United States District Court,
D. Pennsylvania.

Feb. 14, 1983.

Gary Sharlock, Pittsburgh, Pa., for North Side Deposit Bank.

Thomas Daley, Asst. U.S. Atty., Pittsburgh, Pa., and Johnathan B. Forman, Tax Div., U.S. Dept. of Justice, Central Region, Washington, D.C., for the Government.

Liberty Vehicle Leasing was not represented by counsel.

## MEMORANDUM

McCUNE, District Judge.

This is a federal tax case. The government asserts liability against North Side Deposit Bank (North Side) for unpaid withholding taxes (WT), 26 U.S.C. §§ 3401, *et seq.,* and Federal Insurance Contributions Act (FICA), 26 U.S.C. §§ 3101, *et seq.,* of

Liberty Vehicle Leasing, Inc. (Liberty), for the *third quarter of 1974,* the *second, third and fourth quarters of 1975,* and the *first quarter of 1976;* and the Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301, *et seq.,* taxes of Liberty for *1975 and 1976.* The government has filed two suits, alleging alternate theories of North Side's liability: at No. *80–487* violation(s) of sections 6672, 3505(a), and 3505(b) of the 1954 Internal Revenue Code, 26 U.S.C. §§ 6672, 3505(a) and (b); and at No. *81–551,* North Side's tortious conversion or breach of constructive trust of Liberty's tax liened assets. The cases were consolidated and after a non jury trial and a review of the applicable law, we find North Side liable for most of the taxes claimed by the government pursuant to the claim of tortious conversion, and the provisions of 26 U.S.C. § 6672, as amended.

### Background

This dispute arises out of the unfortunate financial condition of a family owned trucking company, deeply in debt to a small bank, which was struggling to keep the debtor afloat until it could be repaid. In the process, the bank became involved in the debtor's affairs.

The Internal Revenue Code assiduously guards withholding and FICA and unemployment taxes. Three of the provisions of the Code are said to be applicable here in the first suit filed at No. *80–487,* §§ 6672, 3505(a) and 3505(b).

It is important to observe that these taxes are assessed by quarters of the year. It is assumed that it is well known that employers withhold these taxes and send them to the government at the end of each pay period, or to a depository bank.

*Section 6672* provides that "any person required to collect, truthfully account for, and pay over any tax imposed by .this title, who wilfully fails to collect such tax or truthfully account for and pay over such tax or wilfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable for a penalty equal to the total amount of the tax evaded or not collected or not accounted for and paid over."

Under Section *6672* the taxes in question are those for the *Third* and *Fourth quarters of 1975,* and the *First quarter of 1976.*

The same taxes are claimed under the provisions of Section *3505(a),* plus the taxes for the *Second quarter of 1975.*

That section reads as follows:

For purposes of sections 3102, 3202, 3402 and 3403 if a lender, surety or other person, who is not an employer under such sections with respect to an employee or group of employees, pays wages directly to such an employee or group of employees, employed by one or more employers, or to an agent on behalf of such employee or employees, such lender, surety or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) required to be deducted and withheld from such wages by such employer.

The same taxes, plus the taxes for the *Second quarter of 1975* are claimed under *Section 3505(b).*

Section 3505(b) reads as follows:

If a lender, surety or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer with actual notice or knowledge (within the meaning of section 6323(i)(1) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender . . . shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender . . . shall be limited to an amount equal to 25% of the amount so supplied to . . . such employer for such purpose.

The taxes claimed for the *Third quarter of 1975* were assessed on February 23, 1976, in the amount of $24,194.67.

For the *Fourth quarter of 1975,* the taxes were assessed on April 5, 1976, in the amount of $39,592.24.

For the *First quarter of 1976,* the taxes were assessed on May 11, 1976, in the amount of $49,974.30.

For the *Second quarter of 1975* (added under § 3505(a) and (b)), the taxes were assessed on August 11, 1975, in the amount of $82,754.41.

Total assessments—$196,515.62.

Under §§ *6672, 3505(a)* and *3505(b),* the government generally claims that North Side was in such control of Liberty that North Side is liable for the taxes just as Liberty was liable; that those sections of the code were designed to prevent the loss of such taxes where employers become overextended and borrow money to meet payroll, so Northside was a person required to collect taxes, or paid wages directly or was a lender who knew that the borrower could not pay the taxes.

It is observed that §§ 6672, 3505(a) and 3505(b) are alternate theories seeking recovery of the same taxes except for the second quarter of 1975 claimed under 3505(a) and (b) only.

In the second suit at *81–551,* the government asserts alternate theories, i.e., that Northside is liable for tortious conversion of property subject to federal tax liens, or is liable for breach of trust with respect to property of Liberty which was subject to prior federal tax claims.

(At No. 81–551, default judgment was entered against Liberty, a joint defendant.)

This suit, 81–551, deals with the *Third quarter of 1974* in the amount of $15,234.58, assessed on April 7, 1975; the *Second quarter of 1975,* in the amount of $82,754.41 (already claimed in the first suit); the *Third quarter of 1975,* in the amount of $24,194.67 (already claimed in the first suit) and the Fourth quarter of 1975 and the First quarter of 1976, as well as FUTA taxes for 1975 and 1976.

(It is observed that if the $15,234.58 is added to $196,515.62, the total is $211,-750.20, which is all the government claims except for the unemployment compensation taxes spoken of later in the amount of $1,171.39. The total claim is $212,921.59 with interest.)

It is alleged that the government filed its notice of federal tax lien for the *Third quarter of 1974* on September 8, 1975; for the *Second quarter of 1975* on October 8, 1975; for the *Third quarter of 1975* on April 7, 1976, for part and on May 7, 1976, for part; for the *Fourth quarter of 1975* on April 12, 1976, for part and on May 7, 1976, for part; for the *First quarter of 1976,* on May 20, 1976, for part and on July 9, 1976, for part.

It is alleged that Northside collected Liberty's accounts receivable, under hauling contracts, from November 1, 1975, onward to December 31, 1975, in the amount of $359,039.23; from January 1, 1976, to February 29, 1976, in the amount of $396,-399.55, and from March 1, 1976, to the date of trial in the sum of $105,757.52.

In addition, it is alleged that Northside seized the property of Liberty on February 28, 1976, and recovered over $103,000.00 in liquidation of it.

It is alleged that on or about November 18, 1975, Northside ordered and received a report which showed the first two liens and Northside therefore had actual notice of them.

Here § 6323(c) comes into play. It places the bank's loans ahead of the federal tax liens on accounts receivable and inventory which was acquired by the borrower within 45 days of the date of filing the tax liens. The government argues that although Northside was secured by a commercial financing agreement, it did not have a perfected lien on any of Liberty's accounts receivable which came into existence more than 45 days after the federal tax liens were filed. The government contends that many of the accounts receivable came into existence and into the bank's hands after the 45 days had expired. It will be neces-

sary as we proceed, to examine the filing dates of the tax liens and the accounts receivable which matured 46 days thereafter and which quarters are of concern. We will attempt to deal with quarters. We do not deal with interest or penalties.

The same argument is applied to the liquidation of the property of Liberty by Northside on or after February 28, 1976. It is alleged that Northside has the burden of proving the priority of its liens over the federal tax liens and as to much of the property liquidated no such showing was made, e.g., antifreeze, fuel, truck parts and bottles. The government claims the $103,-000.00 to satisfy the liens for certain quarters.

Finally, the government argues that Northside is liable for the taxes in question for its breach of trust with respect to the same property because the government had tax liens on it which were entitled to priority. Since the bank favored its own position, it is said to be guilty of breach of trust. The theory is that a constructive trust arose in favor of the government.

The government seeks only one recovery even though various alternate theories for recovery are advanced. As stated above, the total recovery sought for the WT and FICA taxes is $212,921.59 with interest, (including FUTA).

The FUTA taxes for 1975 and 1976 which are claimed amount to $1,171.39, of which $375.99 is claimed due for 1975 and $795.40 for 1976, with interest and penalties. The theories on which the taxes are claimed are those alternate theories already set forth.

The bank denies liability on any theory.

### Findings of Facts

With this background explanation we proceed to relate the relationship of Northside to Liberty and the relevant events.

There is no question that Northside assumed significant control of the affairs of Liberty.

Northside is located at 100 Federal Street, Pittsburgh, Pennsylvania, and at all relevant times provided banking services to Liberty, which was owned and controlled by Arthur Picone and his wife, Carmella, who were officers and directors of the corporation. Liberty had contracts with steel companies to haul products within the steel mills and at times, owned as many as 100 tractors and dump trailers, usually bought on the installment plan and financed by the sellers.

The time which is pertinent begins on December 28, 1973, when the bank made its first loan to Liberty in the sum of $175,-000.00 and continues through 1974, 1975, and 1976. John Tarn was the president of the bank and was a director of the bank and a director of Liberty as well during 1974, and in 1975 until April of 1975.

Carl Brandt was an attorney at law who represented the bank and was a director of the bank in which he was a substantial stockholder (12% of the outstanding shares). He was also a director of Liberty and did legal work for Liberty at times. This relationship existed in 1974 and part of 1975.

The bank was Liberty's Federal Depository bank where Liberty had two accounts, general and payroll, and where it apparently did all of its banking except for a period between July of 1975 and March of 1976, when it kept an account at Equibank in Pittsburgh, of which Tarn and Brandt had no knowledge.

The first loan, for $175,000.00, was secured by a financing statement filed in January of 1974, which purported to cover and which we find did cover Liberty's present and future accounts receivable. Brant and Tarn visited Liberty's terminal before this loan was made and were fully informed of the extent of Liberty's property.

In April of 1974, Liberty received a short term loan of $100,000.00 from the bank. It was renewed several times and was marked paid in August of 1974, when Liberty received a loan of $90,000.00 from the bank. These loans were secured by Picone's personal assets as well, and no new financial statements were filed covering Liberty's assets.

Liberty made piecemeal tax payments of $3,000.00 to $5,000.00 through its Northside depository account in May, June, July and August of 1974. It made a payment of about $34,000.00 in November of 1974, about $59,000.00 in April of 1975 and tried to make a payment of $75,500.00 in May of 1975 by check drawn on its depository account. The bank did not honor this check because of insufficient funds. Brandt personally ordered or recommended that the check be dishonored.

No other tax payments were made by Liberty during 1975 or 1976 except as noted hereinafter.

Frank Traupman was an accountant and a friend of Brandt's upon whose recommendation he became the accountant for Liberty. He prepared financial statements for Liberty which were presented at the bank's board meetings. At least as early as January 1975 the board at Northside was aware of Liberty's serious financial problems.

In April of 1975 Tarn no longer served as a director of Liberty. He apparently resigned.

In May of 1975 Liberty's situation had not improved. Only $40,000.00 of the original $175,000.00 loan had been repaid and the general account was in overdraft status and had been since April of 1975. This condition continued until December 1975 when the account was closed. During this period, April to December 1975, pursuant to bank policy, no statements or cancelled checks were sent to Liberty.

In May of 1975, Northside approved another loan of $300,000.00 conditioned upon, inter alia, Liberty paying payroll taxes due and submitting proof that it was paying its current taxes. We refer, of course, to the payroll taxes.

In June of 1975 Brandt wrote to Liberty, however, stating that the $300,000.00 loan would not be completed due to Liberty's inability to meet the loan conditions as evidenced by the check for $75,500.00, which could not be cleared. At the same time the officers of Northside had second thoughts about the loan because it clearly exceeded its state legal lending limit.

At about the same time, June of 1975, Traupman and Picone met with George Tomchik, the local IRS agent in charge of payroll tax collection, to negotiate a settlement and payment schedule because Liberty was in serious default. The sum owed at this time approximated $250,000.00.

In early July 1975, an agreement was reached with Tomchik. Two $25,000.00 payments were to be made forthwith and monthly payments of $17,100.00 were to be sent directly to Tomchik until the back taxes were paid in full. At the same time Liberty was to make its regular payments as they accrued in the regular manner through the Northside depository account.

Northside received a copy of the agreement upon its completion and execution.

But Liberty's condition was becoming worse. Northside, hampered by its legal lending limit, solicited Equibank to take over and lend Liberty $500,000.00 which would pay off Northside and the taxes and presumably, put Liberty on its feet.

From July of 1975 onward there was little or no use made of Liberty's general account. All checks of whatever nature were written on the payroll account but in early August of 1975, it also went into overdraft status and remained in that state (except for a brief period in December 1975) until the bank closed Liberty at the end of February, 1976, and prepared to liquidate assets.

Following the agreement with Tomchik in July of 1975, the bank honored the two $25,000.00 checks (both in July) and seven checks for $17,100.00 each (August 1975 to February 1976.) These checks were sent directly to Tomchik. Northside also honored payroll tax checks in the regular manner, as Federal's depository bank, until December 31, 1975. These checks were once again for piecemeal payments and all constituted overdrafts. Checks presented in January and February of 1976 were not honored except the ones for $17,100.00.

In late August of 1975, the bank filed confessed judgments against Liberty in the amounts of $135,000.00, the balance of the original $175,000.00 loan, and for the $90,000.00 loan. The judgments remained open and were not executed on until after Liberty was closed. Northside's Exhibit V shows that the judgments were satisfied from Picone's assets, not from accounts receivable.

In August of 1975, Tarn or William Schnebel, a vice president of Northside, began to inspect virtually every check drawn on Liberty's payroll account as they came through. Overdrafts were made known at director's meetings and were listed on an overdraft list distributed to bank officers.

At about this time Liberty began making deposits in an account at Equibank and deposits in Northside decreased. This was noticed at Northside.

Northside began to selectively honor or dishonor Liberty's checks. All payroll checks were honored, checks to Tomchik were honored and checks to customers necessary to keep Liberty in business were honored. From October of 1975 onward a bookkeeper at Liberty would call Tarn and tell him which checks had to be honored. Tarn would initial some checks, indicating that they could be honored. About 22 checks were thus initialed.

On September 8, 1975, the government filed a tax lien for $15,234.58 for the *Third quarter of 1974* payroll taxes.

On October 8, 1975, another tax lien was filed for $82,754.41 for the *Second quarter of 1975*. Other liens were filed later on as will be mentioned hereinafter.

On November 12, 1975, after discussions with Picone, Northside directed Picone to instruct his major customers to send their payments (Liberty's accounts receivable) directly to the bank. This was done. A special bank account was opened and a bank officer was directed to manage the account.

In mid-November, Brandt resigned as a director of Liberty.

On November 18, 1975, the bank received a report on Liberty and Picone listing all property, all judgments, mortgages, and tax liens.

On December 12, 1975, Northside converted Liberty's overdrafts into a loan for $250,000.00. For a short period following this loan, the payroll account was not in overdraft status. Northside, at this time, also released Liberty's bank statements and cancelled checks.

On December 17, 1975, Equibank notified Northside that it would not make the loan for $500,000.00 which had been requested.

On December 18, 1975, another financing statement was filed covering certain of Liberty's P.U.C. certificates to help secure the loan for the $250,000.00. About $42,000.00 of the $250,000.00 loan was repaid before Liberty was closed.

On December 22, 1975, Northside filed another financing statement covering more P.U.C. certificates and on January 28, 1976, another such statement was filed covering still more P.U.C. certificates and "all equipment, machinery, inventory and supplies including all office furniture and equipment and future additions thereto." On January 30, 1976, another such certificate was filed covering still more P.U.C. certificates.

On February 6, 1976, Brandt wrote to Equibank and rebuked Equibank for leading Northside to believe that the loan would be granted. He said "We now realize that we made a mistake in trying to carry these obligations to a point that exceeded our lending limit but we felt that commitments made by officials of a prominent banking organization would be kept and that the problem would be solved." (Plf.'s Exh. No. 16).

On Friday, February 27, 1976, Northside closed Liberty. In due course all equipment and inventory was sold and the proceeds distributed (See Northside Exh. V). When the closedown occurred, Liberty's debt to Northside was between $400,000.00 and $650,000.00. In the first quarter of 1976 overdrafts, alone, came to about $130,000.00. Of this amount, $124,000.00 represented overdraft payroll checks.

On Monday, March 2, 1976, Picone called Tomchik to advise that he had been closed. Tomchik called Tarn and Robert Wagner, a member of Brandt's law firm and an attorney for Northside, to inquire. Tarn informed Tomchik that the tax payments for January and February 1976 had not been honored because Liberty's account had been in overdraft status. Wagner gave Tomchik the same advice.

Northside continued to collect and distribute Liberty's accounts receivable.

From November 1, 1975 to December 31, 1975, Northside received $359,039.23 in accounts receivable; from January 1, 1976 to February 29, 1976, receipts were $396,-399.55, and from March 1, 1976 to the date of trial, $105,757.52. The bank has also collected in liquidation of Liberty's property, $40,100.72 in which, it admits, it had no security interest.

There follows an analysis of the government's assessments and the dates of filing liens and the balances due.

The bank does not contest the assessment dates, the filing dates or the balances due. It simply defends that it is not liable under any of the theories advanced:

| TYPE OF TAX | DATE OF ASSESSMENT | AMOUNT | BALANCE | DATE OF NOTICE OF TAX LIEN* |
|---|---|---|---|---|
| 7409 WT–FICA | 4/7/75 | $76,416.84(T) 2,142.51(FTP) 1,867.60(I) | $15,234.58 | 9/8/75 (3rd Qtr. '74) |
| | 6/23/75 | 357.08(FTP) 512.90(I) | | |
| | 9/1/75 | 754.26(DHC) | | |
| 7506 WT–FICA | 8/11/75 | 78,610.66(T) 3,930.53(FTD) 213.22(I) | 82,754.41 | 10/8/75 (2d Qtr. '75) |
| 7509 WT–FICA | 2/23/76 | 76,845.08(T) 1,091.77(FTP) 1,469.03(I) | 24,194.67 | 4/7/76 (3d Qtr. '75) 5/7/76 |
| 7512 WT–FICA | 4/5/76 | 55,708.42(T) 2,785.42(FTD) 179.90(FTP) 62.10(I) 581.70(DHC) | 39,592.24 | 4/12/76 (4th Qtr. '75) 5/7/76 |
| 7603 WT–FICA | 5/11/76 | 47,495.34(T) 2,374.77(FTD) 100.19(I) | 49,974.30 | 5/20/76 (1st Qtr. '76) 7/9/76 |
| 7512 FUTA | 3/8/76 9/12/77 | 2,516.68(T) 337.78(T) 38.21(I) | 375.99 | (1975) |
| 7612 FUTA | 5/11/76 | 795.40(T) | 795.40 | 5/20/76 7/9/76 (1976) |
| | | TOTAL | $212,921.59** | |

(T)     Tax
(I)     Interest
(DHC) Dishonored Check Penalty
(FTP) Failure to Pay Tax Penalty
(FTD) Federal Tax Deposit Penalty
*        All notice of tax liens were filed with the Prothonotary's Office, Allegheny County, Pittsburgh, Pennsylvania
**      Plus interest and penalties as provided by law.

I

*Conversion Theory*

*Conclusions of Law*

We shall first address the government's tortious conversion theory.

The following allocates amounts due to relevant quarters:

| Period | Amount Due |
|---|---|
| 3rd Quarter 1974 | $15,234.58 |
| 2d Quarter 1975 | 82,754.41 |
| 3d Quarter 1975 | 24,194.67 |
| 4th Quarter 1975 | 39,592.24 |
| 1st Quarter 1976 | 49,974.30 |
| 1975 FUTA | 375.99 |
| 1976 FUTA | 795.40 |
| | $212,921.59 |

(In the government's Exhibits these amounts vary according to the interest calculated at the time the Exhibit was prepared).

■ Tortious conversion is the deprivation of another's right of property in a chattel or the use or possession of a chattel or other interference therewith without the owners consent and without lawful justification, *Cenna v. U.S.,* 402 F.2d 168, 169, 170 (3d Cir.1968). Good faith or a mistake of law or fact are not defenses in an action for conversion, *Knuth v. Erie-Crawford Dairy Co-op Ass'n,* 326 F.Supp. 48 (W.D.Pa.1971) *affirmed in part, reversed in part,* 463 F.2d 470 (3d Cir.1972) *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973).

The government argues that its tax liens upon Liberty's accounts receivable are entitled to priority over Northside's liens and Northside's appropriation of this property amounts to tortious conversion.

■ The issue requires analysis. One must determine when a choate state lien must give way to a federal lien under the provisions of sections 6323(a), (c), and (h) of the 1954 Internal Revenue Code, as amended.[1]

1. Liens filed first in time are first in right. For a state filed lien to be considered as prior to a federal tax lien it must be choate: identity of the lienor, the property subject to the lien, and the amount of the lien must be established. *United States v. Pioneer American Ins. Co.,* 374 U.S. 84 at 87 and 89, 83 S.Ct. 1651 at 1654 and 1655, 10 L.Ed.2d 770 (1963).

§ 6323. Validity and priority against certain persons.

(a) Purchases, holders of security interests, mechanic's lienors, and judgment lien creditors. The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary.

(c) Protection for certain commercial transactions financing agreements, etc.

(1) In general. To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

(i) a commercial transactions financing agreement, [and]

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

(2) Commercial transactions financing agreement. For purposes of this subsection—

(A) Definition. The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business,

but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.

(B) Limitation on qualified property. The term "qualified property," when used with respect to a commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing.

(C) Commercial finance security defined. The term "commercial financing security" means (i) paper of a kind ordinarily arising in commercial transactions, (ii) accounts receivable, (iii) mortgages on real property, and (iv) inventory.

(h) Definitions. For purposes of this section and section 6324—

Such a determination was made in *Texas Oil and Gas Corp. v. U.S.,* 466 F.2d 1040 (5th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973).

■ Under facts identical to those in this case, the court in *Texas Oil & Gas, supra,* found that choateness and § 6323(c) grant priority over a federal tax lien to a creditor/lender's lien on all of a debtor/taxpayer's accounts receivable which are acquired by the debtor/taxpayer before the 46th day after the date of the tax lien filing. Conversely the government lien has priority over a creditor/lender's lien on all of a debtor/taxpayer's accounts receivable which are acquired by the debtor/taxpayer more than 45 days after the date of the filing of the lien.

Accounts receivable are not "acquired" "until the services [are] rendered and the debt [becomes] owing." *Id.* at 1050.

■ The creditor/lender has the burden of proving whether its lien is choate and inclusive under Section 6323(c), *Rice Investment Co. v. U.S.,* 625 F.2d 565 (5th Cir. 1980).

■ In this case no evidence was presented at trial as to when Liberty actually rendered its hauling service and its customers debts became owing. We must therefore assume that the accounts receivable were acquired by Liberty on the date Northside received them. (See Northside's Exh. V).

The bank filed its first financing statement covering accounts receivable, present and future, on January 3, 1974. The government filed its first tax lien on September 8, 1975. Forty five days later was October 23, 1975. Under *Texas Oil & Gas,* Liberty's accounts receivable collected by Northside after October 23, 1975, are to be awarded to the government to satisfy its lien.

The same rule would hold for the government's second lien filed October 8, 1975. Forty five days later would be November 22, 1975.

Northside admits it collected $359,039.23 of accounts receivable from November 1, 1975 to December 31, 1975. Only $85,350.25 of this was collected before November 22, 1975.

■ The government's liens were for the *Third quarter of 1974* ($15,234.58) and the *Second quarter of 1975* ($82,754.41). Under *Texas Oil & Gas* these liens had priority and the bank was required to pay them before it applied the accounts receivable to its own lien.

The bank could keep the balance of the funds until the government filed another tax lien.

The next tax lien was filed April 7, 1976, 45 days from which was May 22, 1976. This lien was for $2003.77 (part of the *Third quarter of 1975* ).

Exhibit V shows that after May 22, 1976, Northside collected only two accounts receivable, $32.50 on May 27, 1976, and $504.12 on June 17, 1976, for a total of $536.62. Under *Texas Oil & Gas* these amounts were applicable to the tax lien of April 7, 1976, of $2003.77, leaving a balance of $1467.15 due for the *Third quarter lien of 1975.*

At this point the first two and part of the third tax liens have been satisfied. The next lien was filed April 12, 1976, and is not effective as to receivables because accounts receivable were exhausted for purposes of the liens.

■ With respect to the bank's liens on the P.U.C. certificates, equipment and office furniture, the bank has priority. This is because we need consider only the "first in time, first in right" rule of *U.S. v. Pio-*

(1) Security interest. The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss of liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

*neer American Ins. Co.*, 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963).

All of Northside's liens on Liberty's certificates and equipment and furniture were filed prior to February 1, 1976. The first, on December 18, 1975, the next on December 22, 1975, the next on January 28, 1976, and the last on January 30, 1976. These came before the tax liens filed May 7, 1976, May 20, 1976, and July 9, 1976.

■ However, there was certain property in which the bank had no security interest. The bank admits that it sold property of Liberty which realized $40,100.72 (Exh, U) in which it had no security interest. This money must go the the government because of the "first in time, first in right" rule and not because of the *tax liens* but, on the contrary, because of the date of the *tax assessments.*

Because the bank did not perfect a security interest in the assets of Liberty sold for $40,100.72, the government was not obligated to file a tax lien. The government's lien arose automatically by reason of the assessment, see 26 U.S.C. §§ 6322 and 6323(a), (f).[2]

The taxes for the *Third quarter of 1975* were assessed on February 23, 1976, in the amount of $24,194.67 (of that amount, $2003.77 was liened. The balance of the lien is $1467.15 as explained above).

Accordingly, the $40,100.72 is sufficient to pay the $23,658.05 balance of the assessment for the *Third quarter of 1975.* This includes the balance of the tax lien of $1,467.15. It deducts the $536.62 of accounts receivable awarded above.

The aforesaid is also sufficient to cover the 1975 FUTA taxes in the amount of $375.99 and this sum is awarded the government.

This ends the discussion of tortious conversion with the exception of a brief discussion of the arguments of the parties.

■ The government argues that even though § 6323(a) requires the filing of a lien in order to insure priority over the bank's choate liens, Northside lost this advantage because it had actual notice of the assessments prior to the filing date of the tax liens. This argument is without merit. Sections 6323(a) and (f) require the filing of the lien, see 9 Mertens Law of Federal Income Taxation (Zimet Revision) § 54.51 (1977) if the lien of the government is to prevail. The filing of the tax lien is notice under § 6323(f). Whether the lender has actual notice is not material for purposes of this case.

■ Northside argues that its judgments against Liberty for $135,000.00 dated August 28, 1975, and for $90,000.00 dated August 29, 1975, should take precedence over the tax liens of the government filed September 8, 1975, and October 8, 1975, according to the provisions of § 6323(a). This argument is correct, but Northside cannot satisfy these judgments out of accounts receivable. Northside's Exh. V shows that both judgments were satisfied from the sale of Picone's own property which was also subject to the bank's liens.

To permit Northside to alter its accounts to satisfy these judgments from Liberty's accounts receivable would amount to marshalling, 23 Pa.Law Encyclopedia, Marshalling Assets, Sections 1–9. Marshalling is an equitable proceeding and will not be used when there is a remedy at law. Northside chose to satisfy the judgments from Picone's assets against which the judgments took priority. Marshalling in our view should not be permitted now.

■ There is no merit in Northside's second argument that Liberty's accounts receivable were in reality contract rights and therefore secured by the bank's liens filed prior to the government's liens. The bank's financing statement plainly referred to "accounts receivable" and cannot be converted into contract rights.

---

**2.** 26 U.S.C. § 6322 reads "Unless another date is specifically fixed by law, the lien imposed by § 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed ... is satisfied or becomes unenforceable by reason of lapse of time."

■ Finally, Northside argues that its liens and the government's liens attached simultaneously and therefore should be satisfied pro rata out of the accounts receivable. Northside cites one case in support of its argument, *U.S. v. Fleming,* 474 F.Supp. 904 (S.D.N.Y.1979) which relies upon two state cases. Priority of tax liens, however, is a matter of federal law, *U.S. v. Goldberg,* 362 F.2d 575 (3d Cir.1966). *See* also *Texas Oil & Gas, supra,* which refused to permit pro rata distribution.

On the theory of tortious conversion therefore we award the government, with interest:

| | |
|---|---|
| For the Third quarter of 1974 | $15,234.58 |
| For the Second quarter of 1975 | 82,754.41 |
| For the Third quarter of 1975 | 24,194.67 |
| FUTA for 1975 | 375.99 |

## II

### Breach of Trust

*The Alternate Theory of Recovery Called Breach of Constructive Trust*

We conclude that there was no breach of a constructive trust. Constructive trusts are invoked to redress a wrong or to prevent unjust enrichment and to meet the demands of justice, morality, conscience and fair dealing, 39 Pa.Law Encyclopedia, Trusts, Sections 101 and 102 (1961). There is no necessity to invoke the principle here. It is an equitable principle and will not be invoked when there is a remedy at law. Since the government has adequate protection under the Internal Revenue Code, there is no need to apply equitable principles.

## III

The theory under Section 6672(a) which reads:

"Any person required to collect, truthfully account for and pay over any tax ... who wilfully attempts in any manner to evade or defeat such tax ... shall be liable to a penalty equal to the total amount of the tax evaded or not collected or not accounted for and paid over."

■ Three things must be proven to find a violation of 6672(a):

Northside must be a person; a person required to collect and pay the tax, see *Slodov v. U.S.* 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978) and must have acted "wilfully."

■ Northside is such a person, *Pacific National Ins. Co. v. U.S.,* 422 F.2d 26 (9th Cir.1970) *cert. denied* 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 (1970); *Commonwealth National Bank of Dallas v. U.S.,* 665 F.2d 743 (5th Cir.1982).

■ A responsible person is one having the power to see to it that the borrower's taxes are paid, to make final decisions concerning the disbursement of funds of the borrower or to determine which creditors are to be paid and when, *Id.* at 755.

■ "Wilfully" does not require a bad motive but simply a voluntary and intentional failure to collect and pay the taxes withheld from the employees, *Newsome v. U.S.,* 431 F.2d 742 (5th Cir.1970).

■ We find that Northside is not responsible under § 6672(a) for any quarter until the first quarter of 1976. For that quarter the bank is responsible. It should have collected and paid the taxes for the first quarter in the amount of $49,974.30 for the reasons which follow:

On November 12, 1975, Northside directed Liberty to have its receivables sent directly to the bank. This was done because the bank knew that Liberty was in very serious danger of going under. A bank officer was appointed to manage a special account for these receivables.

On November 18, 1975, the bank received a property report showing that the government was filing tax liens.

On December 12, 1975, Liberty's overdrafts were converted into a loan of $250,000.00. The overdrafts had been very large.

On December 18, 1975, the bank started to file additional liens securing P.U.C. certificates and equipment. It knew that Lib-

erty could no longer pay its payroll taxes or anything else.

On December 17, 1975, Northside learned that Equibank would make no loan.

It is true that the checks to Tomchik were honored but the bank knew that those checks were the subject of the July agreement. It is also true that payroll tax checks were honored until December 31, 1975, but checks for payroll taxes after December 31, 1975, were not honored. The bank's officers knew that Liberty could not continue to pay its payroll taxes from December 31, 1975, onward and the officers did not intend to clear any further checks for such taxes. By then it had complete control of Liberty. It was in the position of a "responsible person." It was obligated to collect and pay the payroll taxes without question.

We accept Northside's argument generally that it was engaging in usual and responsible banking practices in an effort to save large losses, but from December 31, 1975 onward, it became a person responsible to the government.

We award nothing under this theory to the government except for the first quarter of 1976, which is awarded in the amount of $49,974.30, with interest, plus the 1976 FUTA taxes in the amount of $795.40 awarded under the same theory.

### IV

#### The Section 3505(b) Theory

(This section will not be requoted for the purposes of brevity).

Under this section we find liability for the first quarter of 1976 and 1976 FUTA taxes for the same reasons, largely, that led to the same conclusion under § 6672.

On December 12, 1975, as stated above, Northside converted Liberty's overdrafts into a loan of $250,000.00. It *had been* a lender of money for the purpose of paying wages because it had honored overdrafts for wages repeatedly during the latter half of 1975. But we find that until December 17, 1975, when Northside received notice

that Equibank was not going to proceed with the $500,000.00 loan, Northside did not have actual notice or knowledge that Liberty did not intend to or would not be able to pay its taxes.

Equibank had misled Northside. It had recorded a mortgage covering Liberty's property on August 6, 1975. This was notice to the world that it had loaned Liberty money. It was reasonable to assume that the loan papers had been executed. It had twice asked Northside's officers for a payoff figure. Although it was unknown to Northside's officers, Equibank had already obtained Liberty's bank account.

At about the same time security interests were perfected by Equimark Commercial Finance Company (an affiliate of Equibank) in various tractors and trailers of Liberty. On July 19, 1975, Equibank had loaned the Picones $25,000.00 to apply to Liberty's taxes. And in August, 1975, Liberty reported to Northside that Equimark Commercial Finance Company had extended a line of credit of $500,000.00.

All signs pointed to a happy ending. Until December 17, 1975, Northside was justified in assuming that the taxes would be paid. From December 17, 1975 onward, however, its officers knew that taxes would not be paid. From this date on there were no formal loans made. The last loan was the conversion of the overdrafts to the $250,000.00 note on December 12, 1975 (Exh. AA). However, from January 1, 1976, to the date of closing, $124,000.00 of payroll checks were honored and all were overdrafts. These were loans for the specific purpose of paying wages with knowledge that the payroll taxes would not or could not be paid.

We therefore award the government 25% of the taxes for the first quarter of 1976, or 25% of $49,974.30 which is $12,493.56, and 25% of the FUTA taxes in the amount of $198.85.

### V

#### The Section 3505(a) Theory

"If a lender ... who is not an employer, with respect to any employee or group

of employees, pays wages directly to such an employee or group of employees or to an agent on behalf of such employees ... such lender shall be liable in his own person to the United States in a sum equal to the taxes (together with interest) required to be deducted and withheld by such employer."

 Our research disclosed that "directly" as used in the statute means exactly that, i.e., the payment must be made to the employees or their agent. An employer may be an agent, see *Derr v. U.S.*, 498 F.Supp. 337 (W.D.Wis.1980); 1982 Federal Tax Regulations Sec. 31.3505–1(a)(2).

 The legislative history of § 3505 reveals that its subsections (a) and (b) were meant to deal, respectively, with direct and indirect third party net payroll financing, see 1966 U.S.Code Cong. and Ad.News, 3722, 3742, 2743.

In this case Liberty employees were paid as follows: Liberty sent payroll information to an outside computer bank which printed the individual employee checks by computer. Liberty received and distributed the checks to its employees who took their checks to their respective banks. Eventually the checks would arrive at Northside. Normally, Northside would honor the checks even though at times this created an overdraft.

Liberty did not know whether the checks would be honored or not. For a period of time, it received no bank statements and did not know the status of its account.

Although Northside was honoring the exact net amount of the payroll checks, it was not making "immediate payment" nor did Northside and Liberty agree on any net financing scheme. Northside did not control the writing of the checks, nor did it know from time to time what the payroll was. It did eventually honor all payroll checks but its involvement was "after the fact."

The link between Northside and Liberty is too attenuated to amount to direct payment as defined under § 3505(a).

We find no liability under § 3505(a) for any of the quarters claimed by the government.

An order follows.