**In re WINDSOR COMMUNICATIONS GROUP, INC. t/a Norcross-Rust Craft Greeting Card Publishers, Debtor.**

**Bankruptcy No. 82–03714K.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 22, 1985.

Edward C. Toole, Jr., Mary F. Walrath, Philadelphia, Pa., for debtor.

Morton Newman, Alan C. Gershenson, Michael G. Neri, Philadelphia, Pa., for Sec. Pacific Business Credit, Inc.

L.J. Lichtenstein, Philadelphia, Pa., for Creditors' Com'n.

## OPINION

WILLIAM A. KING, Jr., Bankruptcy Judge.

Before the Court is the debtor's objection to the contingent claim of Security Pacific Business Credit, Inc. ("Security Pacific"). The claimant contends that the debtor is liable for any amount which may be assessed against Security Pacific by the Internal Revenue Service ("IRS") for payroll taxes owed by the debtor. Security Pacific further contends that its contingent claim against the debtor is secured by three (3) security agreements executed by the parties' predecessors in 1980 as part of a financing arrangement.

The debtor vigorously disputes the validity and status of the claim and asks the Court to rule expeditiously on its objection in order that the plan of reorganization may proceed without further delay. The debtor also maintains that there is sufficient evidence of bad faith on the part of Security Pacific in prosecuting this action to warrant the award of counsel fees to the debtor.

For the reasons stated herein, we will enter an Order disallowing the contingent secured proof of claim of Security Pacific in its entirety and scheduling a hearing to show cause why attorneys' fees and costs should not be awarded against counsel for Security Pacific.

## FACTS [1]

In September, 1980, Windsor Marketing Group, Inc. (hereinafter referred to as "Windsor") and A.J. Armstrong Co., Inc., the predecessor to Security Pacific Business Credit, Inc. (hereinafter referred to as "Security Pacific") entered into a financing arrangement. Security agreements [2] were executed by the parties granting Security Pacific security interests in Windsor's inventory, equipment and accounts receivable. The security interests were properly perfected by UCC–1 financing statements filed in September, 1980.

In accordance with the terms of the security agreements, accounts receivable were collected by Security Pacific and applied against Windsor's outstanding obligations. Windsor could request advances after justifying the need for cash to Security Pacific, in whose discretion it was to authorize or refuse the advancement of funds.

Advances from Security Pacific were the only source of cash available to Windsor for the payment of its tax liabilities and other expenses. In August, 1981, Windsor was unable to make the withholding tax deposits required by the IRS and advised Security Pacific to that effect. Windsor requested advances under the loan agreements in order to pay the withholding taxes on a daily and later weekly basis throughout the fall of 1981, but Security Pacific did not advance funds to Windsor for this purpose.

During the fall of 1981, Security Pacific sent an internal auditor to Windsor's premises approximately every five (5) or six (6) weeks. An independent team of auditors was also sent by Security Pacific to examine Windsor's books and records during this period. Commencing in the spring of 1982, Security Pacific conducted monthly searches for *inter alia* federal tax liens against Windsor. Representatives of Windsor and Security Pacific also conducted in-person meetings at which the unpaid taxes were discussed. At one such meeting on July 29, 1982, the President of Security Pacific, Louis Rubin, voiced his awareness of the unpaid taxes and stated that Security Pacific would not claim a security interest in proceeds to be realized from the sale of Canadian assets of Wind-

---

**1.** This Opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 of the Rules of Bankruptcy Procedure.

**2.** The security agreements executed on September 9, 1980 include (1) an Accounts Receivable Agreement with Rider; (2) an Equipment Sup-

plement to the Accounts Receivable Agreement with Rider A ("the Equipment Agreement"); and an Inventory Supplement to the Accounts Receivable Agreement with Rider A ("the Inventory Agreement") (hereinafter referred to collectively as "the Security Agreements").

sor as long as those proceeds were used to pay a portion of the unpaid taxes.

On August 5, 1982, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Windsor in the United States Bankruptcy Court for the Eastern District of Pennsylvania. The case was converted to a case under Chapter 11 on August 25, 1982. As of the filing of the bankruptcy petition, the aggregate federal tax liability of Windsor was approximately six million dollars. *See* Schedules and Statement of Liabilities filed by Windsor on November 12, 1982. Sometime during October or November, 1982, the IRS began investigating Security Pacific's potential liability for the "trust fund" portion of the unpaid taxes of Windsor under sections 6672 and 3505(b) of the Internal Revenue Code ("IRC"). 26 U.S.C. § 6672 (1954); 26 U.S.C. § 3505(b) (1971).

After the bankruptcy case was commenced, Windsor, its shareholders, Security Pacific, and Hamilton Bank, entered into a "Stipulation Authorizing Distribution of Proceeds, Marshalling Collateral Between Secured Creditors, and Providing for Debtor-in-Possession Financing" ("the Omnibus Stipulation"). The Omnibus Stipulation authorized the transfer of $2,262,522.45 from Hamilton Bank to Security Pacific on January 14, 1983 in full payment of Windsor's indebtedness to Security Pacific. As signatory to the Omnibus Stipulation, Security Pacific expressly consented to the repledging of its collateral to other secured creditors and expressly acknowledged that the payment was in full satisfaction of all outstanding obligations of Windsor.[3] Upon

receipt of the payment, Security Pacific executed UCC–3 termination statements and filed them on January 25, 1983. Thereafter, UCC–1 financing statements were filed by Hamilton Bank and the shareholders of Windsor repledging the same collateral which had previously been pledged to Security Pacific.

In May, 1984, Security Pacific was notified that the IRS was conducting an investigation of the potential liability of Security Pacific for the "trust fund" portion of the unpaid taxes of Windsor totalling approximately 3.6 million dollars.

On July 17, 1984, Security Pacific filed a proof of claim asserting as a basis for liability that:

> The debtor was, at the time of the filing of petition, initiating this case, and still is liable to this claimant for such amount, if any, that may be assessed or recovered against claimant by the Internal Revenue Service for payroll taxes not paid by the debtor, the amount of which is estimated to be approximately $4,500,000.00.[4]

Windsor filed an objection to Security Pacific's contingent secured proof of claim on September 24, 1984.

On October 5, 1984, the Court entered an Order confirming the plan of reorganization proposed by Windsor.[5] As provided for by the plan, the Court retained jurisdiction to hear and determine *inter alia* objections to proofs of claim.

The IRS informed Security Pacific in a letter to counsel on October 19, 1984, that it had discontinued its investigation of Se-

---

**3.** *See* Exhibit D–9, letter from counsel for Security Pacific to Hamilton Bank and Windsor Communications Group, Inc. The letter acknowledges that payment of $2,262,522.45 to Security Pacific Business Credit, Inc. constitutes payment in full of the indebtedness of Windsor to Security Pacific, except for possible chargeback liability covered by Exhibit D–10. Exhibit D–10 states that: Intending to be legally bound hereby, Windsor and Hamilton shall jointly and severally indemnify and save your company harmless from any and all charge-backs occurring from and after the date hereof, including *without limitation checks* returned for non-payment of other bank adjustments, limited, however, in the aggregate to the sum of $100,000.00

relating in any way to, or arising from, the collection of Windsor's accounts receivable by Security.

**4.** Although the proof of claim of Security Pacific asserts potential liability of 4.5 million dollars, Security Pacific has stipulated that it may be liable only for the trust fund portion of the unpaid taxes, which amounts to 3.6 million dollars. *See* Exhibit D–26 at ¶ 7s(ii).

**5.** The IRS has asserted a claim against Windsor which has been classified and treated in the plan of reorganization.

curity Pacific in connection with the unpaid taxes. Notwithstanding this information, Security Pacific argues that its claim is entitled to classification and treatment under the debtor's plan. A hearing was held on Windsor's objection to the claim on November 13, 1984. At the conclusion of the hearing, we held the matter under advisement and requested the parties to submit proposed findings of fact, conclusions of law, and memoranda of law.

## DISCUSSION

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Thus, we may make a final determination of the issues raised by the instant proceeding pursuant to 28 U.S.C. § 157(b)(1) and the Order of Chief Judge Luongo of the United States District Court for the Eastern District of Pennsylvania, dated July 25, 1984, referring all cases under title 11 and all proceedings arising under title 11 or arising in a case under title 11 to the Bankruptcy Judges for the Eastern District of Pennsylvania.

■ The filing of a proof of claim in accordance with the procedure established by the Code and the Bankruptcy Rules constitutes *prima facie* evidence of the validity and amount of that claim. *See* Bankruptcy Rule 3001(f). Then, where an objection has been filed to a proof of claim, the objecting party has the initial burden of going forward with sufficient evidence to rebut the *prima facie* validity of the claim. However, the claimant always has the ultimate burden of establishing the validity of its claim. *See, e.g., In re Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206, 212 (5th Cir.1983); *In re Eastern Fire Protection, Inc.*, 44 B.R. 140, at 142 (Bankr.E.D.Pa.1984); *In re Sepco, Inc.*, 36 B.R. 279, 287 (Bankr.D.S.D.1984); *In re WHET, Inc.*, 33 B.R. 424, 437 (Bankr.D. Mass.1983); *In re Central Rubber Products, Inc.*, 31 B.R. 865, 867 (Bankr.D.Conn. 1983).

Although Security Pacific denies that it has any liability under the Internal Revenue Code for the debtor's unpaid withholding taxes, the proof of claim of Security Pacific is based on the potential for liability under sections 6672 and 3505(b) of the IRC. 26 U.S.C. § 6672 (1954) and 26 U.S.C. § 3505(b) (1971). These two (2) sections were specifically referred to by the IRS in a letter dated October 19, 1984 informing Security Pacific that the IRS was discontinuing its investigation of Security Pacific's potential liability for the "trust fund" portion of the unpaid taxes. Nevertheless, Security Pacific refuses to withdraw its proof of claim apparently for fear that the IRS may decide to re-open the investigation.

Section 6672 of the Internal Revenue Code provides in relevant part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672.

The purpose of 26 U.S.C. § 6672 is to penalize responsible corporate officers or third parties with sufficient control over a taxpayer's business affairs when a corporation has willfully failed to collect or pay over employment or excise taxes.[6] *See e.g., Adams v. United States*, 504 F.2d 73 (7th Cir.1974); *Mueller v. Nixon*, 470 F.2d 1348 (6th Cir.1972), *cert. denied*, 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1001 (1973); *Turner v. United States*, 423 F.2d 448 (9th Cir.1970).

---

**6.** IRS Policy Statement P–5–60, approved November 5, 1956 (IRS Manual MT 128–56, dated February 25, 1976).

In addition, reference has been made to section 3505(b) of the Internal Revenue Code, which provides as follows: [7]

> If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, with actual notice or knowledge ... that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 percent of the amount so supplied to or for the account of such employer for such purpose.

26 U.S.C. § 3505(b) (1971).

In view of the IRS letter indicating that the investigation of Security Pacific has been discontinued, Security Pacific's claim of potential liability under either one of these sections is tenuous at best. However, assuming *arguendo* that the IRS does assess Security Pacific for the "trust fund" portion of the unpaid taxes, we turn then to the key issue, which is, whether Security Pacific would have any claim against the debtor for indemnification or contribution.

Whether a "responsible person" who has been held liable for a tax penalty under section 6672 has a right of indemnity against the employer is "greatly to be doubted". *Spivak v. United States,* 254

F.Supp. 517, 527, 524 n. 9 (S.D.N.Y.1966), *aff'd,* 370 F.2d 612 (2nd Cir.) *cert. denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967). *But see, Reid v. United States,* 558 F.Supp. 686 (N.D.Miss.1983).

Several courts have held that there is no federal common law right of contribution for a party found liable for trust fund taxes under section 6672. *See Sinder v. United States,* 655 F.2d 729, 732 (6th Cir. 1981); *Rebelle v. United States,* 588 F.Supp. 49 (M.D.La.1984); *Rice v. Pearce,* 574 F.Supp. 23 (S.D.Iowa 1983); *Hanhauser v. United States,* 85 F.R.D. 89 (M.D.Pa. 1979). In so holding, the courts have reasoned that there is no federal common law right of contribution between tortfeasors; thus, since responsible persons under section 6672 are tortfeasors, no right of contribution between them exists. *See, Sinder, supra,* 655 F.2d at 732; *Rice, supra,* 574 F.Supp. at 26.

■ Since there is no federal common law right of indemnification or contribution, Security Pacific bases its right to reimbursement from the debtor on the security agreements executed by the parties' predecessors in 1980. Briefly summarized, Security Pacific argues that the debtor was contractually obligated under these agreements to pay withholding taxes; [8] therefore, the debtor's failure to pay these taxes constituted a breach of its contractual obligations. Security Pacific points to a provision in the Receivables Agreements which states that:

> Upon the effective date of termination, all Obligations *whether or not incurred under this Agreement or any supplement hereto or otherwise* shall become

---

**7.** Security Pacific has stipulated that its potential liability is for the trust fund portion of the debtor's unpaid taxes. Therefore, it does not appear that Security Pacific is relying on Section 3505(b) as a basis for its liability since that section limits the liability of a lender to twenty-five (25%) percent of the funds advanced by the lender for the purpose of paying wages. See e.g., *United States v. Intercontinental Industries, Inc.,* 635 F.2d 1215 (6th Cir.1980); *Fidelity Bank v. United States,* 616 F.2d 1181 (10th Cir.1980); *United States v. Park Cities Bank & Trust Co.,* 481 F.2d 738 (5th Cir.1973); *United States v.*

*North Side Deposit Bank,* 569 F.Supp. 948 (W.D. Pa.1983). Nor has any evidence been presented indicating that Security Pacific advanced any monies to the debtor for the purpose of paying wages.

**8.** The Receivables Agreement specifically provides that any failure by the debtor to "pay any F.I.C.A. withholding taxes or other taxes when due" constitutes an event of default thereunder. *See* Receivables Agreement at ¶ 8.

immediately due and payable without notice or demand. *Notwithstanding termination, until all Obligations have been fully satisfied, you shall retain your security interest in all existing Receivables and those arising thereafter,* and we shall continue to assign Receivables to you and turn over all proceeds to you. (emphasis added).[9]

It is on the basis of this language that Security Pacific claims its security interest in the assets of the debtor has not been terminated but rather remains extant: "[W]hile the filing of the UCC–3 Termination Statements may have rendered Security Pacific's security interest in the Debtor's assets *unperfected*, it by no means terminated that security interest." [10]

Finally, Security Pacific claims it had no knowledge of the IRS investigation prior to May, 1984, and that had it known the IRS was considering making such a claim, it would not have authorized the filing of the UCC–3 termination statements or the execution of any documentation which in any way could be interpreted as a release of its security in the assets of the debtor. In effect, Security Pacific is arguing that termination of its security cannot become effective until the debtor satisfies its obligation to pay all taxes owed to the IRS.

■ Security Pacific's arguments, while examples of creative lawyering, only reveal the weakness of its claim against the debtor. Even assuming for the moment that the security agreements between Security Pacific and the debtor were still operative, clearly they did not encompass any right of indemnification or contribution from the debtor for liability under sections 6672 or 3505 of the IRC. Although the Equipment Agreement contained an express indemnity clause, that clause was limited to losses or liabilities incurred by Security Pacific as a result of defending or protecting its security interests or enforcing its rights under the agreement.

■ This Court has extreme difficulty in accepting Security Pacific's characterization of the security agreements as still operative and its security interest as still extant. Security Pacific chooses to ignore the fact that the security agreements were terminated. Security Pacific's acknowledgement that all obligations owed by the debtor were satisfied on January 14, 1983 necessarily included any pre-petition obligation of the debtor to pay taxes. Security Pacific cannot now rely on the agreements to claim that one of those obligations, i.e., the payment of taxes, was not satisfied. Security Pacific accepted the $2,262,522.45 payment called for by the Omnibus Stipulation in full satisfaction of *all obligations* owed by the debtor. Security Pacific simultaneously acknowledged that the satisfaction of these obligations terminated any and all security interests in property of the debtor. UCC–3 termination statements were executed by Security Pacific and filed on January 25, 1983. These termination statements ended all security interests in the debtor's inventory, equipment and accounts receivable. UCC–1 financing statements were then filed on behalf of Hamilton Bank and the shareholders of the debtors repledging the same collateral which had previously been pledged to Security Pacific.

These writings, together with the termination statements, constitute unequivocal, objective manifestations by Security Pacific of its intent to terminate and relinquish all interests in the property of the debtor which it previously held. Consequently, any security interest which Security Pacific previously held was completely extinguished at that point. With the filing of UCC–3 termination statements, Security Pacific's security interest became unperfected and subject to the perfected security interests in the same collateral of Hamilton Bank and the shareholders of the debtor and to the rights of the debtor as a hypothetical lien creditor. *See* 13 Pa.Cons.Stat. Ann. §§ 9301(a), 9302(a), and 9312(e) (Pur-

---

**9.**  *See* ¶ 7 of the Receivables Agreement.

**10.**  *See* Brief of Security Pacific, p. 8.

don 1984); 11 U.S.C. §§ 544(a) and 1107(a). *See also, In re Apollo Travel Inc.,* 567 F.2d 841 (8th Cir.1977).

Security Pacific had ample opportunity to learn about the IRS investigation prior to the execution of these documents. What is even more significant, however, is that Security Pacific knew at the time the documents were executed that the debtor's withholding taxes had not been paid. To now argue that had Security Pacific known about the outstanding tax obligations of the debtor, it would not have executed UCC–3 termination statements is a misstatement of the facts.

In summary, we find that Security Pacific has not contractual right to indemnification or contribution for any future penalty assessed by the IRS in connection with the unpaid taxes.[11] In the absence of such a right, Security Pacific would have no basis upon which to make a claim against the debtor for indemnity or contribution even in the unlikely event that the IRS decides to impose a penalty against Security Pacific. In view of our holding, we need not address the alternative argument raised by the debtor under section 502(e)(1)(B) of the Bankruptcy Code for disallowance of Security Pacific's claim.

---

**11.** Even if Security Pacific had obtained a contractual right to contribution or indemnification from the debtor in the event of liability under section 6672, such a right would not be enforceable.

In *Rebelle v. United States,* 588 F.Supp. 49, 52 (M.D.La.1984), the Court stated:

However, when a person *willfuly* acts and has a penalty assessed pursuant to section 6672, that person should not and *must not have that liability for the penalty shared or placed wholly on another because of some contractual or fiduciary duty.* The sound policy reasons against allowing a right of contribution or

indemnity to someone who has willfully, consciously, and intentionally acted must and do apply under the facts of this case. The high penalty, and the omission by Congress of such a statutory right of contribution or indemnity, are intended to deter such willful conduct. It is for the Congress and not the courts to formulate a common law right of contribution when a penalty is assessed under section 6672. Thus, even if this Court construes the cross-claim of Miller and Robertson as alleging a breach of contract or fiduciary duty, the cross-claim still fails to state a claim upon which relief can be granted.