In The Matter of **TUNXIS CORPORATION dba Tunxis Electronics, Debtor.**

The **TUNXIS CORPORATION dba Tunxis Electronics, Plaintiff,**

v.

**UNITED BANK & TRUST CO., H. H. Scott, Inc., Rotel of America, Inc., ITT Terryphone Corporation, U. S. Pioneer Electronics Corp., Internal Revenue Service, State of Connecticut, Craig Corporation, Defendants.**

Bankruptcy No. 2–80–00759.
Adv. No. 2–80–0399.

United States Bankruptcy Court,
D. Connecticut.

March 24, 1982.

Dwight Owen Schweitzer, Hartford, Conn., for debtor-plaintiff.

Thomas A. Gugliotti, Hartford, Conn., for United Bank & Trust Co., defendant.

Thomas J. Shortell, Hartford, Conn., for H. H. Scott, Inc., defendant.

John P. McAllister, Tax Division, Dept. of Justice, Washington, D. C., and Richard Blumenthal, U. S. Atty., New Haven, Conn., for United States of America, Internal Revenue Service, defendant.

Richard H. Seidman, and Alan J. Barth, Hartford, Conn., for Craig Corp., defendant.

Robert U. Sattin, Hartford, Conn., for Creditors' Committee.

## MEMORANDUM AND ORDER

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

This proceeding requires determination of priorities in the disbursement of funds realized from the sale of property of Tunxis

Corporation dba Tunxis Electronics (Tunxis), the debtor-in-possession.

## BACKGROUND

Tunxis, a stereo and hi-fi retailer, filed a petition under chapter 11 on July 21, 1980. At the time of the filing, Tunxis operated several stores in Connecticut. On September 10, 1980, by complaint, Tunxis sought an order from this court authorizing the sale of the assets of two stores and its service department (property), free and clear of existing liens, to TRP Corporation (TRP). Tunxis listed the following entities as claiming an interest in the property pursuant to prepetition financing statements filed with the Secretary of State's office: United Bank & Trust Co. (UBT), H. H. Scott, Inc. (Scott), Rotel of America, Inc. (Rotel), ITT Terryphone Corp. (ITT), Craig Corp. (Craig) and U. S. Pioneer Electronics Corp. (Pioneer). Also listed were the United States Internal Revenue Service (IRS), and the State of Connecticut as claiming prepetition tax liens on file at the Secretary of State's office. The complaint requested that after sale these interests attach to the proceeds "to the extent the proceeds are attributable to the said liens and encumbrances as of record appears."

After hearing, the court entered an order on September 30, 1980, approving the sale of the property to TRP free and clear of liens. The order provided for the sale of the equipment constituting the service department, Tunxis' trade name, and the inventory, furniture, fixtures, hand tools, equipment and machinery located at the two stores for a total purchase price of $90,000.00. Of this price, $25,000.00 was payable at closing in cash and the balance of $65,000.00 was to be paid by the execution of a promissory note calling for month-ly installments based on a seven-year payout, but with a final balloon payment due after two years. The note was secured by a first lien on the property. The order required that Tunxis "institute a satisfactory procedure for an accurate inventory of the assets being transferred, including a specific and detailed schedule of all items being sold" with the right of a UBT representative to be present to observe the inventory-taking on behalf of all creditors.

After completion of the sale on October 1, 1980, UBT filed the present motion for determination of priorities and disbursement of funds. A pretrial order was entered which provided that twenty days prior to a second pretrial conference, all parties would submit lists of the documentary evidence upon which they would rely to establish the existence and perfection of their security interests in the property of the debtor. UBT, Craig, Scott, and the IRS complied with the pretrial order.[1] The creditors' committee complied with the order on behalf of Rotel, Pioneer and ITT.[2]

At trial, where only counsel for UBT, IRS, and Craig were present, oral testimony was received from Donald Bowers (Bowers), president of Tunxis and the officer who was primarily responsible for the acquisition of the Tunxis inventory. He identified, by way of invoices[3] introduced into evidence, all purchases of inventory made by Tunxis after May 30, 1980[4] and prior to July 21, 1980, when Tunxis filed its petition. Bowers further identified inventory lists, admitted into evidence without objection, setting forth the inventory transferred to TRP pursuant to the sale (inventory lists). These documents listed each item of inventory by manufacturer at the invoice price to Tunxis. TRP paid the same price per item to Tunx-

1. Scott and Craig are manufacturers of products sold to Tunxis and are owed $133,261.62 and $133,761.59, respectively. UBT was a lender to Tunxis and is owed in excess of $90,-000.00.

2. Initially, the creditors' committee also filed on behalf of the IRS. The IRS objected to such representation. Rotel, Pioneer and ITT have failed to participate further in this proceeding and are hereby defaulted for failure to appear and defend.

3. Exhibits Nos. 5, 6, and 7 are invoices for inventory purchased from two distributors (Opus and Acoustic) and one manufacturer (Magna).

4. The significance of the May 30, 1980 date is examined *infra.*

is.[5] Bowers testified that although most of the products on the inventory lists were purchased prior to May 30, 1980, Tunxis continued to buy and sell inventory after May 30 and continuing through the date of sale to TRP on October 1, 1980. He could not state with certainty when any individual item on the inventory lists was purchased. The filed debtor's reports disclose that between July 22, 1980 and September 30, 1980, Tunxis purchased inventory at a cost of $16,879.62.

The appearing parties have stipulated that prepetition financing statements and tax liens were properly filed, that the sums claimed due from Tunxis to each party were correct, that of the total sale price of $90,000, $20,000 was allocable to Tunxis' inventory as shown on the inventory lists and $70,000 was for all remaining non-inventory property. The security agreements of Scott and Craig provide for security interests only in products manufactured or sold by each manufacturer. The inventory lists disclose, *inter alia*, that the Scott inventory had an invoice value of $2,657.00; that the Craig inventory had a value of $1,025.56; and that the Magna inventory had a value of $2,238.20.

On January 22, 1982, and February 3, 1982, further hearings were held concerning the taking of judicial notice of the Tunxis monthly reports and court orders governing the postpetition use and disposition of inventory and cash collateral. These orders authorized Tunxis to use inventory and the cash proceeds therefrom which were subject to the security interests of UBT and other secured creditors, and provided that post-

petition inventory and cash collateral would be subject to these same security interests.[6] The orders stated that it was the intention that the "position of security held by the United Bank and Trust Company and other secured parties . . . shall not be diminished by the use of proceeds to buy inventory . . .". The orders resulted from an application filed by UBT on July 30, 1980 to restrain Tunxis from using the proceeds from the sale of inventory.

## DISCUSSION

### I.

UBT is the sole party claiming the $70,-000.00 derived from the sale of the non-inventory property. It relies on its undisputed debt and security agreement in which Tunxis granted it a blanket interest in Tunxis' inventory, contract rights, raw materials, work in progress, equipment, fixtures, furniture and general intangibles, together with after-acquired property and proceeds. Having been presented with no argument against UBT's entitlement, the court finds that $70,000.00 is due and payable to UBT.

### II.

Determining the priorities to the $20,-000.00 resulting from the sale of the inventory is the difficult problem in this proceeding. Based on its security agreement, Scott claims that it is entitled to $2,657.00, being the proceeds from the Scott products on the inventory lists. It claims it sold no Scott products to Tunxis after May 30, 1980.

---

5. Inventory not purchased by TRP was moved to another store operated by Tunxis.

6. Absent court order, § 552 of the Bankruptcy Reform Act, which governs the effect of postpetition security interests, provides that:
   (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
   (b) Except as provided in sections 363, 506(c), 544, 545, 547, and 548 of this title, if the debtor and a secured party enter into a security agree-

ment before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

Similarly, Craig alleges no sales to Tunxis after May 30, 1980 and claims $1,025.56 of the proceeds. By virtue of its blanket security interest, UBT claims it is entitled to that amount of the proceeds not due Scott and Craig under their purchase money security agreements and not due the IRS based on its tax lien filed on April 15, 1980 in amount of $18,105.54.[7] UBT claims that, at most, the IRS is entitled to $2,238.20, the value of the Magna inventory.[8] The IRS claims the entire $20,000.00 under its lien.[9]

### III.

Under § 6321 of the Internal Revenue Code (Code), when a person refuses or neglects to pay any tax after demand a lien arises in favor of the United States "upon all property and rights to property, whether real or personal, belonging to such person." I.R.C. § 6321 (1981). By operation of § 6322 of the Code, the lien imposed by § 6321 arises at the time the assessment is made and continues until liability is satisfied.[10] The validity and priority of the lien arising under § 6321 is subject to the provisions of § 6323 which provide safeguards to holders of certain other interests in the taxpayer's property. Specifically, § 6323(c) provides protection to certain commercial financing arrangements:

(1) *In general.*—To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

(i) a commercial transactions financing agreement, . . . and

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

(2) *Commercial transactions financing agreement.*—For purposes of this subsection—

(A) *Definition.*—The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, . . .

but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.

---

7. The IRS also filed a subsequent tax lien on June 10, 1980, in the amount of $8,920.16. Its proof of claim asserts it is owed $62,049.69 in unpaid taxes.

8. UBT computes its minimum entitlement at $14,164.50, being the $20,000.00 inventory proceeds less the amounts due Scott ($2,567.00), Craig ($1,025.30), and the IRS ($2,238.20).

9. The parties, except for the IRS as hereafter noted, but including counsel for the unsecured creditors' committee, are in general agreement that, in view of the orders of the court granting each secured creditor whose cash collateral was used a security interest in the postpetition inventory sufficient to replace its cash collateral, the period for determining priorities ends with the filing of the Tunxis petition for relief on July 21, 1980. The court will treat the priority issue accordingly. The IRS position is that its federal tax lien continues to attach to inventory acquired by Tunxis after the date of filing the petition. Even assuming that the IRS lien did attach to postpetition property, it would still be primed by the replacement lien on all postpetition property granted the secured creditors by court order in return for use of the secured creditors' cash collateral. *See* 11 U.S.C. § 361 (1981). Nothing in the record suggests the secured creditors improved their position by having their security interests attach to more property than was covered by their security interests on the date of the chapter 11 filing.

10. The tax lien will attach to the taxpayer's after-acquired property. *Rice Investment Co. v. United States*, 625 F.2d 565, 568 (5th Cir. 1980).

The term "commercial financing security" is defined to include "inventory", § 6323(c)(2)(C) and, thus, inventory acquired by the taxpayer before the 46th day after the date of the tax lien filing becomes "qualified property." § 6323(c)(2)(B). The IRS having filed its notice of lien on April 15, 1980, the parties agree the last safe day for acquiring qualified property was May 30, 1980. In order to avoid the impact of the tax lien imposed by § 6321, the burden is upon a creditor with a financing agreement to prove that its security interest was acquired by the taxpayer either before [11] or within the 45-day safe period after the filing of the tax lien. *Rice Investment Co. v. United States*, 625 F.2d 565 (5th Cir. 1980).

Based on the record made in this proceeding, Craig and Scott claim that they are entitled respectively to the proceeds of the items on the inventory lists which they manufactured. They say that they have shown that no security interest was acquired after the safe period ended (after May 30, 1980). UBT avers that the only products on the inventory lists that could possibly be products acquired after May 30, 1980 are the Magna products, since no other item on the inventory lists corresponds to the products shown on the invoices in Exhibits 5, 6 and 7.

The IRS opposes this method of proving which portion of the inventory is or is not subject to the tax lien. It argues that the inventory lists produced by Bowers were summaries originally made by TRP and do not indicate the acquisition dates for the inventory sold to TRP; and that Bowers admitted he had no records at trial by which to ascertain when all the inventory on the lists was acquired by Tunxis. IRS contends that the evidence introduced is inadequate to meet the three creditors' burden of proving that the inventory sold was qualified property, that is, property acquired by Tunxis before May 31, 1980. In the IRS view, the creditors must prove when each item of inventory sold was acquired by Tunxis and, not having done so,

the entire inventory proceeds of $20,000.00 rightfully belong to the IRS.

## IV.

The IRS's arguments as to the inaccuracy of the lists submitted by Bowers must be rejected. While the lists submitted by Bowers were taken from summaries prepared by TRP, that fact does not make the lists inaccurate. These lists were introduced into evidence without objection by the IRS and its post-trial attempt to discredit them is unavailing. The IRS argument that UBT, Scott, and Craig must prove when each item of inventory was acquired in order to establish whether the item is qualified property pursuant to § 6323(c)(1) and (2) of the Code is not supportable. Nothing in § 6321 indicates that dates of acquisition must be proven as long as it can be shown the property was not acquired during a period when the tax lien could attach. The case relied upon by the IRS on this issue, *Rice Investment Co. v. United States, supra,* does not hold that creditors must prove the exact date of purchase of each inventory item for purposes of satisfying § 6323(c)(2). In *Rice,* the Fifth Circuit Court of Appeal reversed an order granting summary judgment to a creditor who had alleged a prior interest in the proceeds of property levied upon by the IRS. In remanding with directions to enter summary judgment for the United States, the opinion noted that:

> During the proceedings, in response to interrogatories propounded by the United States, Rice acknowledged that it did not have any information in its possession by which it could determine the exact date on which the Debtor acquired the inventory which was seized by the Internal Revenue Service. Further, Rice admitted, in its motion for summary judgment, that none of the actual inventory on hand in October, 1973, when the security agreement was entered into, was part of the inventory seized and sold on August 28, 1974, and November 14, 1974.

625 F.2d at 567 (footnote omitted). Here, and unlike *Rice,* UBT, Scott and Craig have

---

11. Section 6323(a) of the Code provides that the lien imposed by § 6321 shall not be valid as against any holder of a security interest until the lien is filed.

shown that the inventory sold pursuant to the court-approved sale was either part of the inventory purchased by Tunxis prior to May 31, 1980 or after July 21, 1980. They have presented evidence which is sufficient to show what inventory was acquired after the safe period ended on May 30, 1981 and prior to July 21, 1980 which is the only period when the IRS lien could attach and have been prior to the claims of the secured parties.

Bowers testified that inventory received after May 30, 1981 and to the date of the petition came from Magna, Opus and Acoustic.[12] Of the inventory sold to TRP, $2,238.20 is for equipment supplied by Magna. None of the equipment supplied by either Opus or Acoustic appears among the items sold. Accordingly, the IRS lien has priority to $2,238.20, the proceeds of the Magna inventory. Bowers testified that no Craig or Scott products were acquired between May 31, 1980 and July 21, 1981. The amount of $1,025.26 representing the proceeds from the sale of Craig products, is therefore payable to Craig, and the sum of $2,657.50, the proceeds from the sale of Scott items, is payable to Scott.[13]

The remaining proceeds of sale in the amount of $14,078.74 is hereby ordered paid to UBT by virtue of its blanket security interest in Tunxis' property.

## V.

The question remains of how to apportion the cash on hand and payments of the note as received from TRP. UBT suggests each party receive a pro rata share of both the cash on hand and payments of the note. I believe this is a reasonable proposal. Disbursements will be made according to the following schedule both as to cash on hand and payments received over the life of the note:

| Secured Party | Dollar Amount of Assets | Percentage Expressed As A Function of Total Sales Price |
|---|---|---|
| Internal Revenue Service | $ 2,238.20 | .025 |
| H. H. Scott, Inc. | $ 2,657.50 | .030 |
| Craig Corporation | $ 1,025.56 | .011 |
| United Bank & Trust Co. | $84,078.74 | .934 |

---

**12.** *See* note 3 *supra.*

**13.** UBT has questioned the validity of Scott's security agreement with Tunxis. That agreement states that Scott is given a continuing security interest in Tunxis' inventory, which is defined as: "All indebtedness owing or to become owing by [Tunxis] to Secured Party arising from [Tunxis'] acquisition of H. H. Scott, Inc. products, including all products manufactured by H. H. Scott, Inc." UBT claims that a literal reading of the security agreement reveals that Scott is being granted an interest in the "indebtedness" which Tunxis owes to Scott. For purposes of creating an Article Nine security interest, any description of "personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." Conn.Gen.Stat. § 42a–9–110 (1981). The financing statement filed with the Secretary of State provided that it covered "[p]resent and hereafter acquired H. H. Scott, Inc. inventory wherever located including but not limited to hi fi and stereo components and consoles, home entertainment centers, speakers, turntables, accessories equipment and allied products, and proceeds from the sale of such inventory."

I cannot find that the description in the security agreement is so unreasonable that an interested party would not know what interest was being granted to Scott. Consequently, I find that the security agreement is sufficient to entitle Scott to the Scott proceeds of the inventory sold.