578 So.2d 158 (1991)
Elfray J. DUPRE
v.
JOE'S RIVERSIDE SEAFOOD, INC.
No. CA 90 0032.
Court of Appeal of Louisiana, First Circuit.
March 28, 1991.
*159 Robert U. Soniat, James R. Reid, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for petitioner.
Russel J. Cremaldi, Darnall, Biggs, Trowbridge, Supple & Cremaldi, Franklin, for intervenorCommercial Bank & Trust Co.
Joseph I. Billiot, in Pro. Per.
Gerald J. Arceneaux, Westwego, for Sheriff Harry Lee.
Gary R. Allen, Chief, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for appellant.
*160 Before COVINGTON, C.J., and LANIER and GONZALES, JJ.
LANIER, Judge.
This action commenced as a suit in contract by a vendor seeking (1) the balance due on the purchase price of crabmeat, (2) recognition of its vendor's lien and (3) a writ of sequestration. Suit was filed by Elfray J. Dupre, the vendor, against Joe's Riverside Seafood, Inc. (Riverside), the purchaser. The trial court ordered the crabmeat sequestered. Commercial Bank & Trust Company (Commercial), a creditor of Riverside, intervened seeking recognition of its security rights in the crabmeat, or recovery of its value. The trial court ordered the sale of the sequestered crabmeat and deposit of the proceeds into the registry of the court. The Internal Revenue Service (IRS) filed a Notice of Levy attaching all proceeds derived from the sale. An agreement was reached by Dupre, Riverside and Commercial, pursuant to which the trial court entered a consent judgment which ordered the proceeds of the sale, $57,621.83, be distributed $46,097.46 to Commercial and $11,524.37 to Dupre. The clerk of court (Clerk) refused to distribute the proceeds because of the IRS levy. Commercial then filed a rule for a writ of mandamus against the Clerk and the IRS asserting that its security rights primed the IRS tax lien and it was entitled to have the Clerk distribute the proceeds in accordance with the consent judgment. After a hearing, the trial court found, as a matter of law, that Commercial's security rights primed the IRS tax lien and ordered the Clerk to distribute the proceeds in accordance with the consent judgment. The IRS took this devolutive appeal.

FACTS
The relevant facts were stipulated by the parties, in pertinent part, as follows:
1. At all times relevant to this case, Joseph Billiot, d/b/a Joe's Riverside Seafood, and Joe's Riverside Seafood, Inc., were engaged in the business of purchasing, processing and selling seafoodparticularly crabmeat in Saint Mary's [sic] Parish.
2. Mr. Billiot and the corporation began borrowing money from Commercial Bank & Trust Company in 1983.
3. On July 16, 1985, Joe's Riverside Seafood, Inc., pledged as security for its indebtedness to Commercial Bank & Trust Co. three collateral mortgage notes which in turn were secured by chattel mortgages.
4. One of the aforementioned collateral mortgage notes, which was dated November 3, 1983, and was in the original face amount of $60,000, was secured by a chattel mortgage on all inventory of Joe's Riverside Seafood, Inc.
5. The collateral mortgage securing this note was recorded in the mortgage and conveyance records of Saint Mary's [sic] Parish on November 11, 1983....
6. Another of the collateral mortgage notes described in paragraph 3 above, this one dated May 30, 1984 and in the original face amount of $400,000.00 was also secured by a chattel mortgage on the inventory of Joe's Riverside Seafood, Inc.
7. The collateral mortgage securing this note was recorded in the mortgage and conveyance records of Saint Mary's [sic] Parish on May 30, 1984....
8. The amount currently due on the notes described above exceeds the amount on deposit with this court in connection with this court [sic].
9. On February 26, 1986, and for the periods listed below a duly authorized delegate of the United States Secretary of the Treasury made assessments against Joe's Riverside Seafood, Inc., pursuant to the Federal Insurance Contributions Act (26 U.S.C. §§ 3101, et seq.) on [sic] the following amounts:

 TAX PERIOD AMOUNT OF
 ENDED ASSESSMENT
 6/30/85 $50,819.92
 9/30/85 $34,019.28
 12/31/85 $ 4,064.27

10. Despite notice of said assessments and demand for payments thereof, Joe's Riverside Seafood, Inc., paid only *161 $21,278.08 against them before ceasing operations.
11. Accordingly, there is presently due and owing on the assessments described in paragraph 9 above the sum of $83,971.07, plus interest and statutory additions thereto.
12. The Notice of Federal Tax Lien with respect to the assessments described in paragraph 9 ... was filed in the mortgage and conveyance records of Saint Mary's [sic] Parish in [sic] April 26, 1986.
13. On August 1, 1986, Joe's Riverside Seafood, Inc., placed 167 containers of crabmeat in storage at the New Orleans Cold Storage and Warehouse Co., Ltd.
14. Commercial Bank & Trust Company held collateral mortgages on this crabmeat, which constituted inventory of Joe's Riverside Seafood, Inc.
15. New Orleans Cold Storage and Warehouse Co., Ltd., issued a warehouse receipt with respect to the crabmeat described in paragraph 14 above in the name of Joe's Riverside Seafood, Inc., and in care of Commercial Bank & Trust Company....
16. The warehouse receipt explicitly provided that notice to the bank was necessary for withdrawal of the crabmeat.
17. Joe's Riverside Seafood, Inc., pledged its interest in the aforementioned warehouse receipt to Commercial Bank & Trust Company by means of a Collateral Pledge Agreement dated August 1, 1986....
18. This Collateral Pledge Agreement was filed in the mortgage and conveyance records of Jefferson Parish on August 11, 1987[[1]], and in the records of Saint Mary's [sic] Parish on October 23, 1986.
19. Commercial Bank & Trust Company has been in possession of the warehouse receipt at all times pertinent to this case.
20. On October 2, 1986, Elfray J. Dupre' initiated this action alleging that he had sold crabmeat to Joe's Riverside Seafood, Inc., and that Joe's Riverside Seafood, Inc., owed him $51,662.89 as the unpaid sales price of said crabmeat.
21. Elfray J. Dupre' claimed a vendor's lien on the crabmeat described in paragraph 13 above and subsequently had it sequestered.
22. On October 21, 1986, Commercial Bank & Trust Company filed a petition in intervention claiming that it had a security interest in the crabmeat senior to any vendor's lien Elfray J. Dupre' might have.
23. On January 16, 1987, Elfray J. Dupre' sought and, on January 19, 1987, obtained from this Court an order directing the Sheriff of Jefferson Parish to sell the aforementioned crabmeat and deposit the proceeds of the sale into the registry of this Court.
24. On February 11, 1987, the Sheriff of Jefferson Parish sold the aforementioned crabmeat and deposited the proceeds of the sale, totaling $57,621.83, into the registry of this Court.
25. These proceeds (hereinafter the "Fund") are the subject of the instant litigation between the United States and Commercial Bank & Trust Company.
26. By service on the Clerk of this Court on March 6, 1987, of a Notice of Levy dated February 12, 1986, the United States attempted to seize the Fund to satisfy the assessments against Joe's Riverside Seafood, Inc., described in paragraph 9 above.
27. On March 31, 1988, Elfray J. Dupre' and Commercial Bank & Trust Company reached an agreement as to the division of the Fund between themselves.
28. However, because of the levy described above, the Clerk of this Court has refused to disburse the funds. 29. In response, Commercial Bank & Trust Company joined the United States *162 as a party to this action, which has, thus, become a concursus proceeding.
30. Commercial Bank & Trust Company did not become aware of the federal tax liens against the property of Joe's Riverside Seafood, Inc., until after it perfected its security interest in the warehouse receipt described in paragraph 15 above.
31. There [sic] no competent or direct evidence as to when Joe's Riverside Seafood, Inc., acquired the crabmeat described above. (Footnote omitted)

RANKING OF THE FEDERAL TAX LIEN

(Assignment of error number 1)
The IRS contends the trial court erred in finding its tax lien was primed by Commercial's security rights[2] and in awarding the proceeds of the sale of the crabmeat to Commercial and Dupre.
The principal statutory provisions governing federal tax liens are Sections 6321-6323 of the Internal Revenue Code, 26 U.S.C.A. §§ 6321-6323. Section 6321 gives the IRS a lien in the amount of a delinquent taxpayer's liability upon all property and rights to property, whether real or personal, belonging to the taxpayer. This lien arises on the date the IRS assesses the unpaid taxes, applies to currently owned as well as after-acquired property and continues until the taxpayer satisfies the debt or the statute of limitations runs. 26 U.S.C.A. § 6322; Metropolitan National Bank v. United States, 901 F.2d 1297 (5th Cir.1990); Texas Commerce Bank-Fort Worth, N.A. v. United States, 896 F.2d 152 (5th Cir.1990); Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston, 892 F.2d 1530 (11th Cir.1990). The question of whether and to what extent a taxpayer has "property" or "rights to property" to which a tax lien attaches is determined under the applicable state law. Metropolitan National Bank v. United States, 901 F.2d at 1300; Du-Mar Marine Service, Inc. v. State Bank & Trust Company of Golden Meadow, LA., 697 F.Supp. 929 (E.D.La. 1988). In this case, the applicable state law is that of Louisiana. It is undisputed that the taxpayer owned, or had rights to, the subject property (crabmeat), to which the federal tax lien attached.
Once it has been determined under state law that the taxpayer owns property or rights to property, federal law controls for the purpose of determining whether an attached tax lien has priority over competing liens asserted against the taxpayer's property. Metropolitan National Bank v. United States, 901 F.2d at 1300; Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston, 892 F.2d at 1534; Du-Mar Marine Service, Inc. v. State Bank & Trust Company of Golden Meadow, LA., 697 F.Supp. at 933; Capital Savings Association v. Runnels, 361 So.2d 458 (La.App. 1st Cir.1978); M. Rubin, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty SymposiumSecurity Devices, 40 La.L.Rev. 572, 586 (1980).
Under prior federal law, two basic principles governed the adjudication of the priority of competing liens: (1) "the first in time is the first in right"; and (2) a federal tax lien is superior to a nonfederal lien that is inchoate.[3]Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston, 892 F.2d at 1534; Rice Investment Company v. United States, 625 F.2d 565 (5th Cir.1980). However, the Federal Tax Lien Act of 1966 (Act), 26 U.S.C.A. § 6323, modified the IRS's preferred position under these doctrines and recognized the priority of many state claims over federal *163 tax liens.[4]Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston, 892 F.2d at 1534. In passing the Act, Congress sought to conform the lien provisions of the Internal Revenue Code to the concepts developed in the Uniform Commercial Code and provide some limited, but specific, relief from the harshness of the choateness doctrine for commercial lenders whose loans and collateral may change daily. Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston, 892 F.2d at 1534-1535; Rice Investment Company v. United States, 625 F.2d at 569.
Section 6323, as amended by the Act, sets forth certain limitations on the validity and priority of federal tax liens imposed by Section 6321 against certain lien holders. Metropolitan National Bank v. United States, 901 F.2d at 1300; Rice Investment Company v. United States, 625 F.2d at 569. The provisions of Section 6323 are referred to as the shelter, safe haven and exemption provisions of the Act. Rice Investment Company v. United States, 625 F.2d at 569; In Re May Reporting Services, Inc., 115 B.R. 652 (Bankr.D.S.D.1990); Coventry Care, Inc. v. United States, 366 F.Supp. 497 (W.D.Penn.1973).

Burden of Proof Under 26 U.S.C.A. § 6323
The IRS contends Commercial has the burden of proving its security rights fall within the provisions of Section 6323 and prime the federal tax lien.
The rules of evidence control which party in a proceeding has the burden of proof. Questions of evidence, such as the burden of proof, are governed by the law of the forum. Bass v. Prewett, 225 La. 883, 74 So.2d 150 (1954); Harnischfeger Sale Corporation v. Sternberg Co., 179 La. 317, 154 So. 10 (1934); State v. Thomas, 504 So.2d 907 (La.App. 1st Cir.), writ denied, 507 So.2d 225 (La.1987); Honeycutt v. Indiana Lumbermens Mutual Insurance Company, 130 So.2d 770 (La.App. 3rd Cir.1961); Wasson v. Gatling, 184 So. 596 (La.App. 2d Cir.1938); see also 16 Am. Jur.2d Conflict of Laws §§ 131 and 134 (1979); 29 Am.Jur.2d Evidence § 6 and 7 (1967); 15A C.J.S. Conflict of Laws § 22(9) (1967); McCormick on Evidence, § 349 (3d ed. 1984).
Generally, in Louisiana in a civil case, the plaintiff has the burden of proving each and every essential element of his claim by a preponderance of the evidence. Gustafson v. Koch, 460 So.2d 655 (La.App. 1st Cir.1984). Proof by a preponderance of the evidence requires that, taking the evidence as a whole, it shows the fact sought to be proven to be more probable than not. Moore v. McDermott, Inc., 481 So.2d 602 (La.), republished, 494 So.2d 1159 (La. 1986). Generally, the burden is on the plaintiff to intially establish a prima facie case, and failure to establish such a case defeats his cause of action. Prima facie evidence is evidence sufficient to establish a given fact, which, if not rebutted or contradicted, will remain sufficient. Once a prima facie case has been established by the plaintiff by a preponderance of the evidence, the burden shifts to the defendant. Gulf Wide Towing, Inc. v. F.E. Wright (U.K.) Limited, 554 So.2d 1347 (La. App. 1st Cir.1989); Harrigan v. Freeman, 498 So.2d 58 (La.App. 1st Cir.1986). Further, one who asserts a fact must carry the burden of proof of that fact by a preponderance of the evidence. Moore v. McDermott, Inc., 481 So.2d at 605; Meyer v. State, Department of Public Safety, 312 So.2d 289 (La.1975), Gustafson v. Koch, 460 So.2d at 656.
The party who contends he comes within an exception to a general rule established by a statute, must prove it. Cambridge Corner Corporation v. Menard, 525 So.2d 527 (La.1988); Hortman-Salmen *164 Co. v. White, 168 La. 1049, 123 So. 709 (1929).
In the rule for a writ of mandamus, Commercial is the plaintiff, and the IRS is the defendant. Thus, under the general rule, Commercial has the burden of proving that its security rights prime the IRS tax lien under Section 6323. Also, since Commercial contends it comes within an exception to the general rule purusant to Section 6323, it has the burden of proof.[5]

26 U.S.C.A. § 6323(a)
The IRS contends the federal tax lien takes priority over Commercial's security rights under Section 6323(a) because Commercial failed to prove that its security rights attached to the crabmeat before the IRS filed notice of the federal tax lien.
Under Section 6323(a), a federal tax lien shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) [26 U.S.C.A. § 6323(f) ] has been filed by the IRS. In order to come within the protections of this statute, a holder of a security interest must establish four conditions: (1) that the security interest was acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss; (2) that the property to which the security interest was to attach was in existence at the time the tax lien was filed; (3) that the security interest was, at the time of the tax lien filing, protected under state law against a judgment lien arising out of an unsecured obligation; and (4) that the holder of the security interest parted with money or money's worth. 26 U.S.C.A. § 6323(h)(1); Metropolitan National Bank v. United States, 901 F.2d at 1300; Texas Commerce Bank-Fort Worth, N.A. v. United States, 896 F.2d at 161-162; Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston, 892 F.2d at 1535.
The IRS concedes that Commercial established three of these four elements; it challenges Commercial's assertion as to the date the property interest in the inventory (crabmeat) came into existence. Where a security agreement grants an interest in after-acquired property of the taxpayer, the taxpayer must have acquired ownership of the property for the security interest to attach. La.R.S. 9:5351(B); Arenson International, Inc. v. Shelving Systems Corp., 369 So.2d 1212 (La.App. 2d Cir. 1979).
The parties stipulated that there was no competent or direct evidence as to when Riverside acquired ownership of the crabmeat. Thus, we are unable to determine if the crabmeat was "in existence" at the time the tax lien was filed on April 26, 1986; and, therefore, Commercial has failed to establish one of the conditions necessary under Section 6323(a) for its security rights to prime the IRS tax lien. See Texas Commerce Bank-Fort Worth, N.A. v. United States, 896 F.2d at 161-162.

26 U.S.C.A. § 6323(b)
The IRS contends the warehouse receipt issued for storage of the crabmeat is not a negotiable instrument under Louisiana law and, thus, is not a security entitled to priority over a federal tax lien under Section 6323(b)(1).
Section 6323(b)(1) provides as follows:
(b) Protection for certain interests even though notice filed.Even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid

*165 (1) Securities.With respect to a security (as defined in subsection (h)(4))
(A) as against a purchaser of such security who at the time of purchase did not have actual notice or knowledge of the existence of such lien; and
(B) as against a holder of a security interest in such security who, at the time such interest came into existence, did not have actual notice or knowledge of the existence of such lien. (Original holding)
Section 6323(h)(4) states the following:
(4) Security.The term "security" means any bond, debenture, note, or certificate or other evidence of indebtedness, issued by a corporation or a government or political subdivision thereof, with interest coupons or in registered form, share of stock, voting trust certificate, or any certificate of interest or participation in, certificate of deposit or receipt for, temporary or interim certificate for, or warrant or right to subscribe to or purchase, any of the foregoing; negotiable instrument; or money. (Emphasis added, original holding)
It is undisputed that Commercial was the holder of a security interest (collateral pledge agreement) in the warehouse receipt and that it did not have actual knowledge of the IRS tax lien until after it had perfected its security interest in the warehouse receipt. The only question remaining is whether the warehouse receipt was a security as defined in Section 6323(h)(4).
Under Section 6323(h)(4), a security is categorized as being either (1) any bond, debenture, note, or certificate or other evidence of indebtedness, issued by a corporation or a government or political subdivision thereof, with interest coupons or in registered form, share of stock, voting trust certificate, or any certificate of interest or participation in, certificate of deposit or receipt for, temporary or interim certificate for, or warrant or right to subscribe to or purchase, any of the foregoing; (2) a negotiable instrument, or (3) money.
Clearly, the warehouse receipt is not money. It is also not other evidence of indebtedness as contended by Commercial. To be considered as other evidence of indebtedness, the warehouse receipt had to be issued by a corporation or a government with interest coupons or in registered form. It was not in this case.
The only remaining possibility is that the warehouse receipt is a negotiable instrument. Since the Internal Revenue Code does not define negotiable instrument as used in Section 6323(h)(4), we must look to Louisiana law.
La.R.S. 10:1-201(45) defines a warehouse receipt as a receipt issued by a person engaged in the business of storing goods for hire. La.R.S. 10:7-201 et seq. contains special provisions dealing with warehouse receipts. La.R.S. 10:7-104, dealing with negotiable and non-negotiable warehouse receipts, states the following:
(1) A warehouse receipt ... is negotiable
(a) If by its terms the goods are to be delivered to bearer or to the order of a named person; or
(b) Where recognized in overseas trade, if it runs to a named person or assigns.
(2) Any other document is non-negotiable....
(3) A provision inserted in a negotiable warehouse receipt, ... that it is non-negotiable is void.
(Emphasis added)
The warehouse receipt, a copy of which is attached hereto as Appendix "A", provides that the crabmeat was received for the account of "Joe's Riverside Seafood, Inc. % Commercial Bank & Trust Co." It further provides that "Bank Notice Needed For Withdrawal". The warehouse receipt also specifies in its terms and conditions as follows: (1) "Written orders, properly signed, are required for the delivery or transfer of property."; (2) "If a negotiable warehouse receipt has been issued, it must be surrendered for indorsement [sic] or cancellation before delivery or transfer of a part or all of the property covered thereby."; and (3) "Negotiable warehouse receipts *166 will be issued only on request of the storer."
The warehouse receipt does not by its terms provide for delivery of the goods to bearer or to the order of a named person. The language of the warehouse receipt indicates that it was not intended by the parties to be negotiable. Therefore, we find that the warehouse receipt in question was not negotiable under La.R.S. 10:7-104 and, thus, was not a security as defined under Section 6323(h)(4). Since the warehouse receipt is not a security, Commercial is not entitled to priority over the IRS tax lien under Section 6323(b)(1). The trial court erred in holding otherwise.

26 U.S.C.A. § 6323(c)
The IRS contends that Commercial's security rights are not entitled to priority over its tax lien under Section 6323(c) because Commercial failed to prove that Riverside acquired ownership of the crabmeat prior to or within 45 days after the filing of the notice of the tax lien.
Section 6323(c) provides, in pertinent part, as follows:
(c) Protection for certain commercial transactions financing agreements, etc.
(1) In general.To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which
(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting
(i) a commercial transactions financing agreement, ... and
(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.
(2) Commercial transactions financing agreement.For purposes of this subsection
(A) Definition.The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)
(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or
(ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;
but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.
(B) Limitation on qualified property.The term "qualified property", when used with respect to a commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing.
(C) Commercial financing security defined.The term "commercial financing security" means (i) paper of a kind ordinarily arising in commercial transactions, (ii) accounts receivable, (iii) mortgages on real property, and (iv) inventory.
. . . . .
(Original bolding)
The court in Rice Investment Company v. United States, 625 F.2d at 569-572 in discussing Section 6323(c) as it applied to inventory stated the following:
Congress enacted the Federal Tax Lien Act of 1966 in an effort to conform the lien provisions of the Internal Revenue Code to the concepts developed in the Uniform Commercial Code. Another primary objective was to provide some limited but specific relief from the harshness of the choateness rule for, among others, commercial lenders whose loans and collateral may change daily.17
*167 Section 6323 of the Internal Revenue Code, as amended by the Federal Tax Lien Act of 1966, sets forth certain limitations on the validity and priority of federal tax liens imposed by § 6321 of the Internal Revenue Code as against certain persons, including the holder of a security interest in property which is the subject of such a lien. Subsection (c) of § 6323 is the provision designed to provide a safe haven for the holders of security interests arising in certain commercial financing arrangements. Subsection (c) provides, in relevant part, that
even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which
(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting
(i) a commercial transactions financing agreement, ... and
(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.
The balance of subsection (c) and subsection (h) define the terms used in subsection (c). Four of those definitions are relevant for our purposesthe definitions of "commercial transactions financing agreement," "qualified property," "commercial financing security" and "security interest." The term "commercial transactions financing agreement" is defined as
an agreement (entered into by a person in the course of his trade or business)
(i) to make loans to the taxpayer to be secured by commercial financial security acquired by the taxpayer in the ordinary course of his trade or business,
. . . . .
but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.
The term "qualified property," when used with respect to a commercial transactions financing agreement, is defined to include "only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing."18 The term "commercial financing security" is defined to mean "(i) paper of a kind ordinarily arising in commercial transactions, (ii) accounts receivable, (iii) mortgages on real property, and (iv) inventory." Finally, subsection (h)(1) of § 6323 defines the term "security interest" as follows:
The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.
Under subsection (c) of § 6323, the holder of a security interest competing for priority with a federal tax lien who is able to demonstrate that such security interest meets the requirements of subsection (c) and the related definition in subsection (h) achieves priority for such security interest over the federal tax lien by virtue of the introductory language of subsection (c) which renders the competing tax lien invalid as against such security interest. It is apparent, simply from reading subsections (c) and (h), that the bolder of a security interest seeking to establish priority thereunder over a competing tax lien must clear several complex hurdles under such subsections, and the failure to clear any one of them leaves the holder outside the safe haven of subsection (c). In the case before the *168 court, the United States argues that in view of Rice's admission that it did not have any information in its possession by which it could determine the date on which the Debtor acquired the inventory seized by the United States on August 18, 1974, Rice would be unable to carry its burden under § 6323 of proving that the inventory was "qualified property," i.e., property acquired by the Debtor before June 11, 1974 (the 46th day after the filing of the tax lien on April 26, 1974). We agree, and we hold that the security interest of the United States in the seized inventory is, accordingly, not invalid under § 6323 with respect to the security interest of Rice in such inventory. Our holding is based on the clear language of the statute, and is strongly supported by the equally clear legislative history....
17. S.Rep. No. 1708, 89th Cong., 2d Sess., reprinted in [1966] U.S.Code Cong. & Admin. News, pp. 3722, 3729. According to the Senate Report, protection for a security interest arising out of a commercial transactions financing agreement "is afforded only where the loan or purchase is made not later than 45 days after the tax lien filing (unless actual notice or knowledge of the filing is obtained sooner) and only where the inventory, accounts receivable, etc., are acquired before the 45 days have elapsed." The Senate Report states further as follows:
In the case of inventory and accounts receivable financing, it is customary for a business, after establishing a line of credit, to receive advances from time to time as its needs arise. The security in such a case customarily is the inventory, accounts receivable, etc., which the business receives from time to time in the ordinary course of its business. The loan may be secured by these assets (including replacements of the initial assets) or these assets themselves (except inventory) may be sold to the financier. Under present law, a filed tax lien has priority over the rights of the lender or purchaser if the funds are not advanced, or the security purchased, until after the tax lien filing. In addition, it has priority under present law if the initial assets are replaced with assets acquired after the tax lien filing. As a result, under present law for a lender or purchaser to be sure that no tax lien has recently been filed, he must search the records each time before making an additional advance or purchase. The provision added by the bill is designed to keep this obligation within practical bounds by giving the interests arising under the agreements providing for these loans or purchases priority over a filed tax lien if the loans or purchases are made not later than 45 days after the tax lien filing and before the lender or purchaser has actual notice of the filing. In this regard it should be noted that the standard of perfection (i.e., validity against judgment liens) in this regard is the same for a purchaser (including a bona fide purchaser) as it is for the holder of a security interest. This provision thus generally gives an inventory or accounts receivable, etc., financier assurance that his loans or purchases are not inferior to some recently filed tax lien as long as he searches the records at least once every 45 days.

See also H.R.Rep. No. 1884, 89th Cong., 2d Sess. (1966).
18. See 26 C.F.R. § 301.6323(c)-1(d) (1979), which provides as follows:
(d) Qualified property. For purposes of paragraph (a) of this section, qualified property consists solely of commercial financing security acquired by the taxpayer-debtor before the 46th day after the date of tax lien filing: Commercial financing security acquired before such day may be qualified property even though it is acquired by the taxpayer after the lender received actual notice or knowledge of the filing of the tax lien. For example, although the receipt of actual notice or knowledge of the filing of the notice of the tax lien has the effect of ending *169 the period within which protected disbursements may be made to the taxpayer, property which is acquired by the taxpayer after the lender receives actual notice or knowledge of such filing and before such 46th day, which otherwise qualifies as commercial financing security, becomes commercial financing security to which the priority of the lender extends for loans made before he received the actual notice or knowledge. An account receivable (as defined in paragraph (c)(2)(ii) of this section) is acquired by a taxpayer at the time, and to the extent, a right to payment is earned by performance. Chattel paper, documents of title, negotiable instruments, securities, and mortgages on real estate are acquired by a taxpayer when he obtains rights in the paper or mortgage. Inventory is acquired by the taxpayer when title passes to him. A contract right (as defined in paragraph (c)(2)(i) of this section) is acquired by a taxpayer when the contract is made. Identifiable proceeds, which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired if the secured party has a continuously perfected security interest in the proceeds under local law. The terms "proceeds" includes whatever is received when collateral is sold, exchanged, or collected. For purposes of this paragraph, the term "identifiable proceeds" does not include money, checks and the like which have been commingled with other cash proceeds. Property acquired by the taxpayer after the 45th day following tax lien filing, by the expenditure of proceeds, is not qualified property. (Underscoring added, original emphasis in bold, footnote omitted)
See also, Donald v. Madison Industries, Inc., 483 F.2d 837 (10th Cir.1973); Matter of Tunxis Corporation, 19 B.R. 256 (Bankr.D.Conn.1982).
As stated above, under Louisiana law, Commercial bears the burden of proving its security rights prime the IRS tax lien under Section 6323. Thus, Commercial must prove that Riverside acquired ownership of the crabmeat before the 46th day after the filing of the IRS tax lien.
In this case, the IRS filed a notice of the federal tax lien on April 28, 1986. Commercial's chattel mortgage agreements would give it priority with respect to inventory acquired by Riverside by June 10, 1986, the date 45 days after filing of the notice of the IRS tax lien. Thus, Commercial must prove that Riverside acquired ownership of the crabmeat by June 10, 1986, to comply with the provisions of Section 6323(c)(2)(B).
Commercial acknowledged in the stipulated facts that it could not prove the date on which Riverside acquired ownership of the crabmeat. Thus, Commercial could not prove that Riverside acquired ownership of the crabmeat by June 10, 1986, and, therefore, failed to prove it had a security interest in qualified property under Section 6323(c)(2)(B). Since Commercial failed to sustain its burden of proof, its security rights are not entitled to priority over the IRS tax lien under Section 6323(c). The trial court erred in holding otherwise.

CONCLUSION
The trial court found that Commercial's security rights primed the IRS tax lien and ordered the proceeds from the sheriff's sale distributed to Commercial and Dupre in accordance with the prior consent judgment. We have reviewed the record and applicable law and find the trial court erred as a matter of law in finding Commercial's security rights primed the IRS tax lien.
This assignment of error has merit.[6]

*170 DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered in favor of the IRS ordering the Clerk of Court of St. Mary Parish to distribute the $57,621.83 in the registry of the court to the IRS. Commercial is cast for all costs.
REVERSED AND RENDERED.
*171 
*172
 * EXPLANATION OF CODES
1DELIVERY 11IN BOND
2BLAST FREEZING 12SAMPLING
3SLOW FREEZING 13RECOUPING
4TAKING WEIGHTS 14TRUCKING
5UNLOADING 75UNLOADING PALLET
6LOADING 76LOADING PALLET
7SORTING 77SORTING BY QUANTITY
8REHANDLING 78EX-DOCK IMPORT
9OVERTIME 79REMV. BAND/TAPE
10DISTRIBUTION 80TAPE ONLY
81BOOK TRANSFER 91EXPORT CERTIFICATE
82WT. PKG. LESS THAN = 15 92CONTAINER DRAYAGE
83WEIGHING PRODUCT 93DRAYAGE BREAK BULK
84STENCILING 95TRAILER SPOTTING
85STRAPPING BUNDLE 96TRAILER REMOVING
86STRAPPING PER CASE 97PREPARE B/L
87EXTRA MATERIAL 98MISC. CHARGES
88COLLECTION CHARGES 99S.S. STRIPPING
89PAST DUE CHARGES
90BOOK INVENTORY
 LIABILITY LIMITED TO 25¢/LB.

CONTRACT TERMS AND CONDITIONS

PROPERTY WILL BE ACCEPTED BY THIS COMPANY FOR STORAGE ONLY UNDER THE FOLLOWING TERMS AND CONDITIONS:
Sec. 1. TENDER FOR STORAGE.
(a) All goods for storage shall be delivered at the warehouse properly marked and packed for handling. The storer shall furnish at or prior to such delivery a manifest showing marks, brands or sizes to be kept and accounted for separately and the class of storage desired. Otherwise the goods may be stored in bulk or assorted lots, in freezer, cooler, or general storage, at the discretion of this company and will be charged for accordingly.
(b) The word "lot" as used herein means the unit or units of goods for which a separate account is to be kept by this company. Delivery of all or any part of a lot shall be made without subsequent sorting, except by specific arrangement and subject to a charge.
(c) This company undertakes to store and deliver goods only in the packages in which they are originally received.
*173 Sec. 2. STORAGE PERIOD.
(a) All goods are stored on a month to month basis, unless otherwise provided. A storage month shall extend from a date in `one' calendar month to, but not including, the same date of the next and all succeeding calendar months, but if there be no corresponding date in the next succeeding calendar month it shall extend to and include the last day of that month. When the last day of a final storage month falls on other than a regular business day of the warehouse, the storage month shall be deemed to expire on the next succeeding business day.
(b) Except where other procedure is permitted by law, this company may, upon written notice to the storer of record and to any other person known by this company to claim interest in the property, require the removal of any property by the end of the next succeeding storage month. Such notice shall be given, by delivery in person or by registered or certified mail, addressed to the last known place of business or abode of the person to be notified.
Sec. 3. STORAGE RATES AND INSURANCE.
(a) All charges for storage are on a month to month basis unless otherwise provided in the company's tariff. Charges for any lot shall begin on the date of receipt in storage of the first unit of the lot, and shall continue and include the last storage month during which the last unit of such lot is delivered. Storage charges shall be assessed on the maximum number of units or weight in any lot during a storage month. Storage charges are due on the first day of a storage month. All other charges are due when incurred. No increase in charges within the direct control of this company will be made on property in storage without a 30-day written notice to the storer of record or the last known holder of a negotiable Warehouse Receipt.
(b) This company may transfer the property from one storage facility to another but shall give notice to the storer of record and the last known holder of a negotiable Warehouse Receipt.
(c) Insurance against fire and other hazards is not provided for in the storage rate.
Sec. 4. HANDLING CHARGES.
(a) Handling charges in connection with the initial receipt of any lot will be billed with the first month storage charges. Lot delivery charges will be billed separately.
(b) Unless this company has failed to exercise due care and diligence, this company shall not be responsible for demurrage (and the storer shall reimburse this company for any demurrage which it shall be required to pay), nor shall it be responsible for delays in obtaining cars for outbound shipments, nor for delays in unloading inbound cars.
(c) On the outbound carload shipments, this company acts as agent for the storer who may furnish a checker to verify load and count; otherwise this company's record of load and count shall be conclusive.
Sec. 5. DELIVERY REQUIREMENTS.
(a) Written orders, properly signed, are required for the delivery or transfer of property. All orders shall clearly specify the lot number and particulars of description of the property. Telephone or telegraph orders shall be confirmed in writing, and are accepted by this company prior to confirmation only upon the condition that it shall not be responsible for any loss or error by reason of such acceptance.
(b) Instructions to transfer goods on the books of this company are not effective until delivered to it in writing. If a transfer involves rehandling the property, a charge will be assessed.
(c) If a negotiable warehouse receipt has been issued, it must be surrendered for *174 indorsement or cancellation before delivery or transfer of a part or all of the property covered thereby. Negotiable warehouse receipts will be issued only on request of the storer.
(d) When goods are ordered out, a reasonable time shall be given to carry out instructions.
(e) In case property is lost or misplaced, this company shall be allowed ten days in which to locate property after receipt of written delivery order.
Sec. 6. LIABILITY.
(a) The liability of this company, in the absence of other written agreements, is limited to the reasonable care and diligence required of a warehouseman by law.
(b) All property is warehoused at the owner's risk of loss, damage or delay due to acts of Providence, military authority, insurrection, riots, or by malicious acts of third persons, or enemies of the government, or for any loss or damage of whatsoever nature and howsoever caused if not caused exclusively by the failure of this company to exercise all the ordinary degree of care required of a warehouseman by law. Moreover, all property is warehoused at the storer's risk of loss, damage or delay, due to work stoppage, strikes, picketing, boycotts, embargoes or other labor disputes, involving employees of the warehouseman or others, regardless of the cause. This company assumes no responsibility for concealed damages, leakage from packages, variations in weights, shrinkage in weights, pilferage, theft, odor, rot, taint or other inherent qualities of the merchandise, or from losses by reason of defective or insufficient containers, whether occurring while goods are in storage or are being handled, or for failure to detect or remedy the same. This company assumes no responsibility for losses arising from sprinkler leakage, fire, smoke, windstorm, flood or the influx of rising or surface waters, moths, corruption, depredation by rats, mice or vermin, or any cause beyond control of this company in the exercise of the ordinary degree of care required of a warehouseman by law. Any class of property not properly packaged is accepted by this company at owner's risk.
(c) In the case of goods damaged or lost through negligence of the warehouseman, the reasonable market price of the goods on the date spoilage or loss is discovered shall be the measure of damages, but in no instance shall the liability of the warehouseman exceed 25 cents per pound, unless excess value is declared by the owner at the time the goods are stored. Rates are on the basis of this maximum liability and in the event a storer desires to declare an excess value proportionate rates to cover an added liability on the part of the warehouseman will be assessed.
(d) Claims by the depositor must be presented in writing within a reasonable time, and in no event longer than 80 days after delivery of the goods or discovery of the loss or damage, whichever time is shorter. No action may be maintained by the depositor against this company for loss or damage to goods covered hereunder unless commenced within nine months after delivery of the goods or discovery of the loss or damage, whichever time is shorter.
Sec. 7. LIENS AND SECURITY INTERESTS.
All advances and charges are due and payable before delivery or transfer of property. This company shall have a lien and security interest upon all goods of storer, or the proceeds thereof, at any time deposited by storer in any warehouse. Such lien and security interest shall be for all charges for storage or transportation including demurrage and terminal charges), insurance, labor, or charges present or future in relation to such goods of storer (whether or not heretofore delivered by this company) and for expenses necessary for preservation of such goods *175 or reasonably incurred in their sale pursuant to law, for loans or advances against such goods, and for interest. Upon the nonpayment of any such amounts within a reasonable time, the company may obtain satisfaction of its lien as provided by law upon giving due notice to the storer of record and to all persons known to claim an interest in the goods by registered or certified mail addressed to such persons' last known address at least ten days prior to sale.
Sec. 8. CONTROLLING LAW.
Any provision herein which is in conflict with any local, state or Federal law applicable to the transaction involved shall be inoperative as to such transaction but shall not void or affect the legality of any other provision. The provision hereof, and the rights and remedies of the parties, shall be governed by the laws of Louisiana.
NOTES
[1] The record reveals that the collateral pledge agreement was actually filed in the mortgage and conveyance records of Jefferson Parish on August 11, 1986. The 1987 date found in the stipulation must be the result of a typographical error.
[2] It is undisputed in this case that the security rights of Commercial in the crabmeat were validly perfected under Louisiana law. See La.R.S. 9:5351 et seq.; La.C.C. art. 3133 et seq.
[3] For a nonfederal lien to be considered choate, the identity of the lienor, the property subject to the lien and the amount of the lien must be established beyond any possibility of change or dispute. Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston, 892 F.2d at 1534; Rice Investment Company v. United States, 625 F.2d 565 (5th Cir.1980).
[4] The federal courts have split on the issue of whether the choateness doctrine is still applicable in determining the priority of competing federal tax liens and private liens after the Act. See Metropolitan National Bank v. United States, 901 F.2d at 1304, n. 1; Texas Commerce BankFort Worth, N.A. v. United States, 896 F.2d at 161, n. 8; Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston, 892 F.2d at 1540, n. 20. The result reached in this case would be the same under either solution to this problem.
[5] The federal courts have consistently held that the holder of a security interest competing for priority with a federal tax lien has the burden of proving he comes within the provisions of Section 6323. Rice Investment Company v. United States, 625 F.2d at 571; Texas Oil & Gas Corporation v. United States, 466 F.2d 1040 (5th Cir. 1972), cert. denied sub nom. Pecos County State Bank v. U.S., 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973); In Re May Reporting Services, Inc., 115 B.R. at 658; In Re Concrete Express, Inc., 87 B.R. 718 (Bankr.S.D.Fla.1988); United States v. North Side Deposit Bank, 569 F.Supp. 948 (D.Penn.1983); Matter of Tunxis Corporation, 19 B.R. 256 (Bankr.D.Conn.1982).
[6] Commercial did not seek to have its security rights ranked ahead of the IRS tax lien pursuant to 26 U.S.C.A. § 6323(d). Section 6323(d) provides the following:

(d) 45-day period for making disbursements. Even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing by reason of disbursements made before the 46th day after the date of tax lien filing, or (if earlier) before the person making such disbursements had actual notice or knowledge of tax lien filing, but only if such security interest
(1) is in property (A) subject, at the time of tax lien filing, to the lien imposed by section 6321, and (B) covered by the terms of a written agreement entered into before tax lien filing, and
(2) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.
(Emphasis added, original bolding)
Clearly, Commercial is not protected by Section 6323(d) for two reasons: (1) its security rights came into existence before the tax lien was filed, and (2) it failed to prove that Riverside owned the crabmeat on the date the tax lien was filed.