[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action by the plaintiff, John Fantry, against the defendant, Medical Capital Corporation (MCC), to collect a debt incurred by Amtech Enterprises of Connecticut, Inc. (Amtech). The other named defendant in this action, Queen Medical, Inc. (QMI) has not appeared.
The plaintiff alleges that he is a secured creditor in some or all of the accounts receivable and assets of Aintech with a first priority lien.
The plaintiff brings this action in five counts, namely fraudulent CT Page 230 conveyance, unlawful distribution to a corporate insider, MCC, in violation of Conn.Gen. Stat. § 33-687; conversion by MCC; violation of the obligation of good faith and fair dealing; and violation of the Connecticut Unfair Trade Practices Act.
 FACTUAL BACKGROUND
Amtech was in the business of providing medical equipment and supplies to hospitals, institutions, and patients in Connecticut. MCC was in the business of administering the funds of the companies financed by its related corporations to companies such as Amtech. The receivables for those companies were acquired by "special purpose corporations" all of which were subsidiaries of Medical Capital Holdings, Inc. (Holdings).
In October of 1995, Amtech sold its assets and accounts receivable to Carlmont Special Purpose Corporation I (Carlmont) another Medical Capital Holdings subsidiary, representing to Carlmont that its assets and receivables were unencumbered.
Beginning in 1997, MCC Special Purpose Corporation III (MCC III) provided the funding to Amtech, substituting for the previous MCC company, Carlmont Special Purpose Corporation I.
Amtech was solely owned by H. Donald Thumlert and Raymond Dolan. In 1995 Amtech was in further need of funds for its operation and on June 22, 1995 entered into an agreement with the plaintiff to borrow $150,000. The agreement could convert into an equity option at a future date. It was on this date that the agreement was signed by the plaintiff and Medical Capital Holdings, Inc. (See Exhibit 3). In addition, a promissory note, (Exhibit 4), and what plaintiff claims is the security agreement assigning the accounts receivable was signed also. (Exhibit 5).
In 1996, Holdings acquired a 1/3 stock interest in Amtech. Thereafter, Holdings was able to acquire control of Amtech by placing a majority on its board of directors.
The plaintiff became a consultant to Amtech while Thumlert and Dolan operated the business. Plaintiff was paid on the debt for approximately ten months before Amtech was unable to continue making the parents.
Amtech collected non medicare receivables and was to use them as directed by MCC III. Instead, through the use of a bogus corporation, Thumlert and Dolan directed at least $300,000 to their own use and to debtors of Amtech they wanted satisfied. MCC III claims a loss of approximately $2,000,000 in its dealings with Amtech. CT Page 231
During the period of 1996, until the plaintiff sued Amtech in 1998, the principal officers of Holdings and its subsidiary corporation attempted to dissuade the plaintiff from suing by promising to advise a prospective purchaser (Koons) that plaintiff's debt should be paid.
It should be noted that during the entire period of default by Amtech, the plaintiff took no action to satisfy his debt from the claimed secured receivables or their proceeds when he was legally entitled to do so.
The plaintiff brought suit against Amtech in 1998 and obtained a default judgment on February 28, 2000, which judgment as of the date of this trial was $218,759.69. This judgment has not been satisfied.
Plaintiff brought this action in February of 2000 against Medical Capital Corporation, one of the subsidiaries of the medical capital group of corporations.
The plaintiff has named this company as the defendant because he claims that as administrator of all the funds received by MCC III, it misapplied funds to itself and to the benefit of the other Holdings corporations. These were funds received from the Amtech accounts receivable through a lock box set up for that purpose. As a result, Amtech suffered the losses alleged and consequently was unable to pay the plaintiff.
Plaintiff's claim in five counts will be discussed below. But first the plaintiff's status as a secured creditor must be examined.
 IS THE PLAINTIFF A SECURED CREDITOR OF AMTECH'S ACCOUNTS RECEIVABLE?
If plaintiff is an unsecured instead of a secured creditor, his status is, of course, diminished.
It is the defendants' claim that because plaintiff's security interest was not perfected, he is, in fact, unsecured.
This claim arises out of the following allegations of the defendant:
1. There was no granting clause in the loan agreement:
2. There was no description of the collateral as required by Conn.Gen. Stat. § 42a-302.
 A
CT Page 232 What constitutes a valid security aqreement?
Conn.Gen. Stat. § 42a-9-203 (1) states that: A security interest is not enforceabl'e against the debtor or third parties with respect to the collateral and does not attach unless: (a) the debtor has signed a security agreement which contains a description of the collateral; (b) value has been given; and (c) the debtor has rights in the collateral. In the present action, there is no issue with whether value was given for the security interest, or whether the debtor has rights in the collateral. The defendants argue that the loan and option agreement signed by the parties is insufficient to create a valid security agreement because it does not grant a security interest, and, alternatively, that it does not adequately describe the collateral, as required by statute.
Conn.Gen. Stat. § 42a-9-105 (1) defines "security agreement" as an agreement which creates or provides for a security interest. "Agreement means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in Conn.Gen. Stat. §§42a-1-. 205 and 42a-2-208." (Internal quotation marks omitted.) WalterE. Heller Co., Inc. v. Salerno, 168 Conn. 152, 157-58 (1975). Moreover, "[t]he language in the agreement must be interpreted with fundamental principles of contract law in mind. The intention of the parties to the contract is controlling. Intent is determined from the language of the agreement in light of the situation of the parties and the circumstances of the situation. . . . The language used must be given its plain meaning. . . . The agreement must be construed as a whole and in such a fashion as to give effect to every provision, if possible."Cabaret, Inc. v. Martin and Archambault Limited Partnership I, et al., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 702562 (October 5, 1992, Schaller, J.).
 Can a recital in a contract constitute a valid security agreement?
The defendants first argue that the loan and option agreement is not a valid security agreement because the security interest is found within a recital to the contract. Case law demonstrates, however, that language found within a recital to a contract has always been considered part of the contract and is regarded as a true statement until proven otherwise. "This language [recital in contract claiming that the estate has been attached] is not regarded as an admission that the applicant for the release of the attachment is the owner of the property . . but only as an admission that such applicant has an attachable interest in it. It was held in that case to be a conclusive acknowledgment of only such CT Page 233 ownership in the property by the original defendant as is sufficient to satisfy the statement of the recital that a valid attachment has been made." McNamara v. Mattei, 74 Conn. 170, 173 (1901)
Some cases discussed contained recitals that were considered by the respective courts to be a valid part of the contract and to be construed as true unless proved otherwise by the party opposing them. Under general principles of contract law, facts and agreements should be construed with the intent of the parties in mind, so as to give effect to every provision if possible. Therefore, recitals to a contract can create a valid security agreement.
 Can the language "to be secured" create a valid security agreement?
The defendants argue further that the language "to be secured" relates solely to a future security agreement to be made between the parties, and therefore cannot be construed as creating a present security interest. "The Uniform Commercial Code clearly provides that the obligations covered by the security agreement may include future advances. Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment." (Internal quotation marks omitted.) Chrysler Credit Corp.v. Community Banking Co., 35 Conn. Sup. 73, 75 (1978). Moreover, a recent Appellate Court decision found similar language to be conclusive in creating a security agreement. "The court's finding that the defendant contracted to develop the property is supported by the plain reading of the May 21, 1993 agreement. One of the recitals in the agreement provides that "[t]he [plaintiff] desires to reach an agreement with the [defendant] to develop the said property.' Additionally, the defendant agreed in the contract to pay to the plaintiff a portion of the profit from the sale of homes constructed on the property or of lots sold. It is clear from the four corners of the agreement that the intent of the parties was that the defendant would develop the property." (Internal quotation marks omitted.) Schlicher v. Schwartz, 58 Conn. App. 80, 85-86
(2000) . Lastly, the words "to be secured" are commonly used in security agreements when describing the security interest to be attached. They do not create solely a future intention on behalf of the parties, but rather a present intent. Therefore, the court finds that the language contained in the loan agreement created a valid security interest.
 B What constitutes an adecuate description of the collateral?
Next, the defendants argue that the plaintiff has not perfected his CT Page 234 security interest because the description of the collateral is inadequate. General Statutes § 42a-9-110 provides that: "For the purposes of this article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." The section also notes that the test of sufficiency of a description laid down by this section is that the description do the job assigned to it, i.e. that it makes possible the identification of the thing described. As an example, the statute makes reference to a case involving a security agreement, which stated that the secured creditor was given continuing security interest in the debtor's inventory and defined inventory as "all indebtedness owing or to become owing" by the debtor to the secured creditor. This was sufficient to entitle the creditor to proceeds of courtapproved sale of inventory purchased by the debtor from it prior to attachment of federal tax lien, notwithstanding that, under a literal reading of the agreement, the creditor was being granted interest in "indebtedness"; the description in the security agreement was not so unreasonable that the interested party would not know what interest was being granted to the secured creditor.Matter of Tunxis Corp., 19 B.R. 256 (Bkrtcy. 1982).
In the present case, the discrepancy argued by the defendants is between "certain accounts receivable" and "all accounts receivable." The description of the collateral reasonably identifies what is described, at least to the extent that the interested parties are made aware of what interest is being granted to the creditor. Therefore, the description of the collateral contained within the security agreement reasonably identifies the security interest and is adequate.
 C What if the collateral described in the security agreement is inconsistent with the financing statement filed with the Secretary of State?
Lastly, the defendants argue that the description of the collateral is inadequate because it is inconsistent with the exact language used in the financing statement filed with the state. "A financing statement is sufficient if it, along with other requirements, provides an address of the secured party from which information concerning the secured interest may be obtained." Wickson v. Burruano et al., Superior Court, judicial district of New London, Docket No. 511116 (July 31, 1991, Axelrod, J.). "The financing statement itself indicates merely that plaintiff may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs." Id.; see also Cain v. Country Club Delicatessen of Saybrook,Inc., 25 Conn. Sup. 334-35 (1964); ("the financing statements filed by CT Page 235 First Hartford on August 15, 1962 . . . had an after-acquired property clause in it. . . . The description expressly includes certain specific items of Hewitt goods, and where otherwise, the description of the types of property covered is sufficiently broad to cover any other of the Hewitt goods. A similar clause is also contained in the security agreement")
For the foregoing reasons, the plaintiff has a valid, perfected security agreement in that he (1) signed a security agreement which contained a description of the collateral; (2) value was given; and (3) the debtor had rights in the collateral. The plaintiff has fulfilled all the statutory requirements for attaching his security interest, along with filing a UCC-1 financing statement with the state. There is no requirement that the UCC-1 be attached to the security agreement.
First Count — Fraudulent Transfer against MCC and QMI (violation of General Statutes §§ 52-552b (insiders) and 52-552f (creditor insolvent or made insolvent by transfer).
In this count, the plaintiff alleges that the defendants (MCC and QMI) were insiders who made fraudulent transfers under the statutes to the detriment of the plaintiff.
The pertinent portions of those statutes read as follows:
§ 52-552b. Definitions
(7) "Insider" includes . . . (B) if the debtor is a corporation. (iii) a person in control of the debtor.
(9) "Person" means . . . a corporation . . . § 52-552f. Transfers fraudulent as to present creditors.
(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. . .
(b) a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent. CT Page 236
The court finds that there is a total lack of evidence that QMI participated in any fraudulent transfer. There is no such evidence that the sale of assets by Amtech to QMI was not for equivalent value, that QMI was not an independent corporation or that the asset sale was in any way harmful to the plaintiff. No accounts receivable were included (Ex. F at p. 3 § 1.1b).
On the contrary, the credible evidence is that the proceeds, or substantially all of them, went to the Internal Revenue Service for payment of Amtech's delinquent taxes.
As to the defendant MCC, there is substantial evidence that the same individuals who controlled MCC III did in fact control MCC, and would be an "insider" pursuant to § 52-552f.
The plaintiff, however, in his complaint (par. 6), alleges that MCC took control of Amtech through a stock transfer in 1996. The evidence, of course, is that MCC III not MCC acquired control of Amtech. (The plaintiff in his request to amend filed after the close of evidence which the court did not permit still referred to the QMI sale in 1998 as MCC being the seller).
If this court were still to consider the QMI sale to be an "insider" transaction, the plaintiff's proof would fail because there is no credible evidence that the sale was not for fair value.
The plaintiff, in this count (par. 9) further alleges "that Amtech was insolvent or made insolvent by the transfers" (the second requirement of § 52-552f). In addition, the plaintiff must prove the conveyance was made with a fraudulent intent in which the grantee participated. Tyersv. Coma, 214 Conn. 8, 11 (1990). Fraudulent intent must be proved by clear, precise and unequivocal evidence, Tyers, supra at 11.
Here, again, the plaintiff has failed in his proof. The credible factual evidence does not establish fraudulent intent. See §52-552e (a).
As to the proof of insolvency on the part of Amtech, the evidence offered by the plaintiff is that of a 1996 tax return (Ex. 6) indicating that Amtech's liabilities exceeded its assets. The tax return has deductions for depreciation of assets. There was no evidence of the fairvalue of the assets as required in the statutory definition of insolvency. § 52-552c.
The QMI sale occurred in 1998 and the only evidence of insolvency at that time offered by the plaintiff was the opinion of one of the former CT Page 237 owners (and directors) of Amtech, Raymond Dolan. The court does not credit Mr. Dolan's testimony.
The plaintiff has failed to prove that the transaction in question (par. 9d) would leave Amtech with "unreasonably small business assets" or intended to leave Amtech with debts beyond its ability to pay.
Second Count — (Violation of General Statutes § 33-687 Distribution to Shareholders)
Although the allegations of this count focus on the sale by Amtech to QMI, the plaintiff's argument claims that MCC used Amtech's accounts receivable payments for its own use.
§ 33-687 (c) deals with distributions (formerly dividends) to shareholders which would, in effect, cause the corporation to be unable to pay its debts as they became due in the usual course of business.
There is no evidence that Amtech made any distributions of any kind to any shareholder, corporate or individual.
Certainly the claim against MCC in this count is beyond the scope of the pleadings and further, there is no evidence that any transfer of property to QMI was not for value and contemporaneous and caused an impairment of assets or rendered Amtech insolvent.
The court will discuss below the claim of diversion and misuse of funds by MCC.
Third Count (Conversion)
In this count, plaintiff alleges (par. 9) a conversion by MCC of funds transferred to it by QMI representing payments by debtors of Amtech. MCC allegedly converted funds properly secured by the plaintiff.
The evidence adduced at trial, however, was that Amtech sold its assets to QMI excluding any accounts receivable for $150,000. The Internal Revenue Service was paid the entire proceeds from this sale to satisfy Amtech's tax liabilities. (See Exhibit F). Presumably, it is the plaintiff's theory that much of these funds were consumed or diverted by MCC. As stated above, the court will discuss this claim below, but the court finds herein that "the allegations of this count have not been proven by the plaintiff, and further that the plaintiff has failed to produce evidence that MCC received any of the proceeds of the sale to QMI. CT Page 238
Fourth count — (Violation of Obligation of Good Faith and Fair Dealing)
In this count, the plaintiff again alleges misconduct on the part of MCC by virtue of its receipt and diversion of funds from the QMI sale from Amtech to QMI. As the court has found in count three, MCC received no funds in this transaction because all proceeds went to the IRS to satisfy Amtech's tax liabilities.
In addition, since this theory of liability is imposed pursuant to a contractual relationship between parties, the plaintiff, to prevail must demonstrate that the defendants did not act in good faith or deal fairly with the plaintiff. Mangan v. Anaconda Industries, 193 Conn. 558, 567
(1984). Since QMI had no contractual relationship with MCC there can be no violation of the obligation of good faith and fair dealing.
Plaintiff also makes its claim against MCC pursuant to its "alter ego" theory which the court will discuss below concerning the alleged misconduct of MCC. The court, however, finds no liability under this theory also.
Fifth Count — (Violation of Connecticut Unfair Trade Practices Act)
In this count the plaintiff alleges that the defendants' actions were "improper, immoral, unscrupulous, and unfair in violation of CUTPA. Conn.Gen. Stat. § 42-110a, et. seq.
Our Supreme Court has articulated a standard to determine whether or not a practice constitutes an unfair or deceptive act. This standard was reiterated as late as 1999 in Hartford Electric Supply Co. V.Allen-Bradley Co., 250 Conn. 334 (1999). In that case, the court opined:
 "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the "cigarette rule'fn30 by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it CT Page 239 causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp., 245 Conn. 43. Moreover, this court has set forth a three part test for satisfying the substantial injury criterion: "[1] [the injury] must be substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury that consumers themselves could not reasonably have avoided."
As stated previously in this opinion, the plaintiff has failed to carry his burden of proof in any of the four counts previously discussed, and thus has failed to prove any wrongdoing by these defendants.
A violation of CUTPA has also failed to be proven pursuant to HartfordElectric Supply Co. v. Allen-Bradley Co. under all three criteria specified therein.
 CONCLUSION
Although there was testimony that MCC, acting as administrator for MCC III, took a disproportionate share of the funds it was administering to the detriment of the plaintiff, he has failed to demonstrate to the court's satisfaction that these fees and charges were excessive or even not in accordance with the usual practice in the industry. The vast majority of the funds paid out by MCC were on behalf of Amtech and at the direction of Messrs. Thumlert and Dolan to Amtech's creditors.
A large amount of the funds owned by MCC III were, according to the more credible evidence, diverted by Thumlert and Dolan to the bogus corporation set up by them. From this corporation they paid certain bills to creditors and appropriated other funds to themselves.
In the opinion of the court, this conduct was at least equally responsible for Amtech's financial troubles as any overcharges alleged to MCC.
Finally, the court can only observe and speculate as to why the plaintiff did not pursue his claim to the receivables or the revenue CT Page 240 derived from payments received.
Nothing in the loan agreement prohibited the sale of the receivables secured by the plaintiff. Therefore the collateral could have been legally alienated by Amtech.Gen. Stat. § 42-9-205. Plaintiff had the right to take possession of the collateral or the proceeds. Gen. Stat. § 42-9-306 (2). Nationscredit Corp. v. Ruggini, Superior Court, judicial district of New Haven at New Haven, Docket No. 390338 (February 21, 1997, Freedman, J.).
The plaintiff having failed to prove the allegations of his complaint, judgment may enter for the defendants.
Freed, J.